# UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SHOREVIEW HOLDING LLC, *et al.*,[1] | ) | Case No. 25-10566 |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' FIRST AMENDED DISCLOSURE STATEMENT
## FOR THE FIRST AMENDED JOINT PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**TROUTMAN PEPPER LOCKE LLP**

Daniel Durell (24078450)
Stephen J. Humeniuk (24087770)
300 Colorado St., Suite 2100
Austin, TX 78701
T: (512) 305-4700
F: (512) 305-4800

**TROUTMAN PEPPER LOCKE LLP**

Michael Sabino (admitted *pro hac vice*)
875 Third Avenue
New York, NY 10022
T: (212) 704-6000
F: (212) 704-6288

*Proposed Counsel for the Debtors and Debtors in Possession*
**Dated: July 15, 2025**

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: Shoreview Holding LLC (8428), PLF Shoreview LLC (7602), MDW Shoreview LLC (8649), Shoreview Apartments LLC (6780), PLF Shoreview Mezz LLC (1270), and MDW Shoreview Mezz LLC (3408).  The notice address for the Debtors is 9050 N. Capital of Texas Hwy., Bldg. 3, Suite 320, Austin, TX 78759.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. EACH OF THE CLASSES DESCRIBED HEREIN ARE UNIMPAIRED AND DEEMED TO ACCEPT THE PLAN UNDER THE BANKRUPTCY CODE.**

The deadline for the Holders of Claims or Interests to submit the Opt-Out Form with respect to the Third Party Releases is August 4, 2025 at 4:00 p.m. (prevailing Central Time) (the "**Opt-Out Deadline**") unless the Debtors extend the Opt-Out Deadline. To be counted, the Opt-Out Form must be received by Proposed Counsel to the Debtors, Troutman Pepper Locke LLP ("**Troutman**"), acting as the Debtors' notice, claims, and solicitation agent (the "**Voting Agent**"), no later than the Opt-Out Deadline. To be counted, an Opt-Out Form must be actually received by the Voting Agent before the Opt-Out Deadline as described herein. Holders of Claims and Interests should refer to the Opt-Out Form for further instructions.

Please note that the description of the Plan provided throughout this Disclosure Statement is only a summary provided for convenience. For a complete understanding of the Plan, you should read the Plan, and the Exhibits thereto in their entirety. The Plan is attached as hereto as **Exhibit A**. In the case of any inconsistency between the summary of the Plan in this Disclosure Statement and the Plan, the Plan will govern. The Debtors cannot assure you that the version of the Disclosure Statement, including any Exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Cases will not contain different, additional, or material terms that do not appear in this Disclosure Statement.

This Disclosure Statement has been prepared in accordance with Section 1125 of the Bankruptcy Code and Rule 3016(b) of the Federal Rules of Bankruptcy Procedure and not necessarily in accordance with federal or state securities laws or other nonbankruptcy law. This Disclosure Statement has been neither reviewed nor approved by the U.S. Securities and Exchange Commission ("**SEC**") or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any other such state authority has passed upon the accuracy or adequacy of the statements contained herein. Any representations to the contrary is a criminal offense.

The Debtors recommend that each Holder of Claims and Interests (i) read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under "Risk Factors" below) and (ii) consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby.

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors will be bound by the terms of the Plan and the transactions contemplated thereby.

ii

Shoreview Holding LLC ("<u>Shoreview Holding</u>"), PLF Shoreview LLC ("<u>PLF Shoreview</u>"), MDW Shoreview LLC ("<u>MDW Shoreview</u>"), Shoreview Apartments LLC ("<u>Shoreview Mezz</u>"), PLF Shoreview Mezz LLC ("<u>PLF Mezz</u>"), and MDW Shoreview Mezz LLC ("<u>MDW Mezz</u>") (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>" or the "<u>Company</u>"), are sending you this document and the accompanying materials (the "<u>Disclosure Statement</u>") because you may be a creditor entitled to vote on the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (as may be amended, supplemented, or otherwise modified from time to time, the "<u>Plan</u>").[2] A copy of the Plan is attached hereto as <u>Exhibit A</u> and is incorporated herein by reference. The Debtors are providing the information in this Disclosure Statement to certain Holders of Claims for purposes of soliciting votes to accept or reject the Plan.

On April 24, 2025 (the "<u>Petition Date</u>"), each of the filed voluntary reorganization cases under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>"). This Disclosure Statement has been approved by the United States Bankruptcy Court for the Western District of Texas (the "<u>Bankruptcy Court</u>") as containing "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code. The Debtors are seeking an order of the Bankruptcy Court (a) approving this Disclosure Statement as having contained "adequate information," (b) approving the solicitation of votes as having been in compliance with Section 1126(b) of the Bankruptcy Code, and (c) confirming the Plan. The Bankruptcy Court may order additional disclosures.

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in <u>Article X</u> of the Plan. There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to become effective will be satisfied or, in the alternative, waived.

The Debtors recommend that each Holder of a Claim or Interest consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing this Disclosure Statement, the Plan, and each proposed transaction contemplated by the Plan.

The Debtors strongly encourage Holders of Claims and Interests to read this Disclosure Statement (including the Risk Factors described in <u>Section XII</u> of this Disclosure Statement) and the Plan in their entirety. The Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing (as defined herein).

---

[2] Unless otherwise defined in this Disclosure Statement, all capitalized terms used, but not otherwise defined, in this Disclosure Statement will have the meanings ascribed to them in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.**

iii

**SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS**

The Bankruptcy Court has not reviewed this Disclosure Statement or the Plan, and the securities to be issued on or after the Effective Date will not have been the subject of a registration statement filed with the SEC under the United States Securities Act of 1933, as amended (the "Securities Act"), or any securities regulatory authority of any state under any state securities laws ("Blue Sky Laws").

The Debtors are relying on Section 4(a)(2) of the Securities Act and similar Blue Sky Laws, of the Bankruptcy Code to exempt from registration under the Securities Act and Blue Sky Laws the issuance of shares of New Common Stock to Holders of Notes Claims prior to the Petition Date ("Section 4(a)(2) Securities"), including in connection with the solicitation of votes to accept or reject the Plan (the "Solicitation").

The Debtors will rely on section 1145(a) of the Bankruptcy Code to exempt from registration under the Securities Act and Blue-Sky Laws the offer, issuance, and distribution, if applicable, of New Common Stock under the Plan, and to the extent such exemption is not available, then such New Common Stock shares will be offered, issued, and distributed under the Plan pursuant to other applicable exemptions from registration under the Securities Act and any other applicable securities laws, including Section 3(a)(9) and Section 18(b)(4)(c) of the Securities Act. The Plan has not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the Solicitation nor this Disclosure Statement constitutes an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized or is unlawful.

Except to the extent publicly available, this Disclosure Statement, the Plan, and the information set forth herein and therein are confidential. This Disclosure Statement and the Plan contain material non-public information concerning the Debtors, their subsidiaries, and their respective Securities. Each recipient hereby acknowledges that it (a) is aware that the federal securities laws of the United States prohibit any person who has material non-public information about a company, which is obtained from the company or its representatives, from purchasing or selling securities of such company or from communicating the information to any other person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities and (b) is familiar with the United States Securities Exchange Act of 1934, as amended (the "Exchange Act"), including the rules and regulations promulgated thereunder, and agrees that it will not use or communicate to any Person or Entity, under circumstances where it is reasonably likely that such Person or Entity is likely to use or cause any Person or Entity to use, any confidential information in contravention of the Exchange Act or any of its rules and regulations, including Rule 10b-5.

See the Risk Factors in Section XII of this Disclosure Statement for certain risks that you should carefully consider.

iv

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan. The Debtors believe that the Plan is in the best interests of all creditors and parties in interest and recommend that all Holders of Claims and Interest support Confirmation of the Plan.

Unless the context requires otherwise, references to "*we*," "*our*" and "*us*" are to the Debtors.

Confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan. The Debtors give no assurance that the Plan will be confirmed, or if confirmed, that the conditions precedent to the occurrence of the Effective Date will be satisfied (or waived).

***The Debtors encourage you to read this Disclosure Statement in its entirety, including without limitation the Plan and Section XII of this Disclosure Statement, entitled "Risk Factors," (and all Exhibits) before submitting a Ballot to vote on the Plan.***

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan and the Plan Supplement, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entireties by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and the Debtors give no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and Confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summaries of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entireties by reference to those documents.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein. The financial projections, attached hereto as **Exhibit C** and described in this Disclosure Statement (the "**Financial Projections**"), have been prepared by the Debtors' management in consultation with their advisors. The Financial Projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors or Debtors' management. Important factors that may affect actual results and cause the management forecasts to not be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' (including its ability to achieve strategic and operational goals, objectives

and targets over applicable periods), industry environment, the regulatory environment, general business and economic conditions and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to the ultimate performance of the Reorganized Debtors and any subsidiaries of the foregoing compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the Financial Projections may not be relied upon as a guarantee or other assurance that these projected results will occur.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigations or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence. As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial, or other effects of the Plan to Holders of Claims or Interests or any other party in interest.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements that explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the Restructuring described herein will be consummated. Creditors and other interested parties should see **Section XII** of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

*[Remainder of page intentionally left blank.]*

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II.  EXECUTIVE SUMMARY ................................................................................... 1

    A.  Preliminary Statement ................................................................................. 1
    B.  Overview of the Plan .................................................................................. 2
        1.  Restructuring Transactions .............................................................. 2
        2.  Payment in Full of Allowed Administrative Expense, Other Secured, Priority, and General Unsecured Claims .................................. 3
        3.  General Settlement of Claims and Interests ..................................... 3
        4.  Exit Facilities .................................................................................. 3
        5.  Alternative Equity Restructuring ..................................................... 3
        6.  Releases and Injunctions ................................................................. 4

    C.  Entitlement to Vote ..................................................................................... 4
    D.  Plan Distributions ....................................................................................... 5

III.  INSTRUCTIONS AND PROCEDURES ........................................................ 12

    A.  Holders of Claims Entitled to Vote .......................................................... 13
    B.  Confirmation Hearing ............................................................................... 13
    C.  Notice of Confirmation ............................................................................ 13
    D.  Agreements upon Furnishing Ballots ....................................................... 14

IV.  GENERAL INFORMATION ABOUT THE DEBTORS ............................. 14

    A.  Overview and Operations ......................................................................... 14
    B.  The Debtors' Prepetition Capital Structure .............................................. 15
        1.  Mezzanine Loan ............................................................................. 15
        2.  Mortgage Loan ............................................................................... 16
        3.  Trade and Related Debt ................................................................... 16
        4.  Personal Guarantees ....................................................................... 16
        5.  Equity Interests .............................................................................. 17

V.  CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES ...................................................................................... 17

    A.  Prior Management and Economic Headwinds ........................................... 17
    B.  The Chancery Proceedings and Pre-Petition Restructuring Transactions ........... 18
    C.  Strategic Alternatives ............................................................................... 18
        1.  Restructuring Terms ....................................................................... 18

VI.  CHAPTER 11 CASES ....................................................................................... 19

    A.  Overview of Chapter 11 ............................................................................ 19
    B.  Administration of these Chapter 11 Cases ................................................ 20
        1.  First Day Motions ........................................................................... 20
        2.  Proposed Confirmation Schedule ................................................... 20

C.  Preference and Other Potential Avoidance Actions ............................................ 21
D.  Other Litigation Matters ................................................................................... 21
E.  Assumption and Rejection of Executory Contracts and Unexpired Leases ........ 21
F.  Exclusivity ........................................................................................................ 22
G.  The Cash Collateral Order and the Agreed Lift Stay Order ............................... 22

**VII.  PLAN OF REORGANIZATION ............................................................................... 22**

A.  Administrative Expense Claims and Priority Claims ......................................... 22
    1.  General Administrative Expense Claims ................................................ 23
    2.  Professional Claims ............................................................................... 23
    3.  Payment of Restructuring Expenses ...................................................... 24
    4.  Priority Tax Claims ............................................................................... 24
    5.  Statutory Fees ....................................................................................... 25

B.  Classification and Treatment of Claims and Interests ....................................... 25
    1.  Classification of Claims and Interests ................................................... 25
    2.  Treatment of Claims and Interests ........................................................ 26
    3.  Special Provision Governing Unimpaired Claims .................................. 30
    4.  Elimination of Vacant Classes .............................................................. 30
    5.  Controversy Concerning Impairment ..................................................... 30
    6.  Subordinated Claims ............................................................................. 30
    7.  Discharge of Claims .............................................................................. 30

C.  Acceptance or Rejection of the Plan ................................................................. 31
    1.  Presumed Acceptance by Non-Voting Classes ....................................... 31
    2.  Voting Classes ...................................................................................... 31
    3.  Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
        Bankruptcy Code ................................................................................... 31

D.  Means for Implementation of the Plan ............................................................. 31
    1.  No Substantive Consolidation ............................................................... 31
    2.  General Settlement of Claims and Interests ........................................... 31
    3.  Restructuring Transactions .................................................................... 32
    4.  Reorganized Debtors ............................................................................. 32
    5.  Sources for Plan Distributions .............................................................. 33
    6.  New Equity Interests ............................................................................. 35
    7.  Corporate Existence .............................................................................. 35
    8.  Vesting of Assets in the Reorganized Debtors ....................................... 36
    9.  Cancellation of Existing Securities and Agreements .............................. 36
    10. Corporate Action .................................................................................. 37
    11. New Organizational Documents ............................................................ 37
    12. Indemnification Provisions in Organizational Documents ...................... 38
    13. Managers, General Partners, Directors and Officers of the
        Reorganized Debtors ............................................................................. 38
    14. Effectuating Documents; Further Transactions ...................................... 38
    15. Section 1146 Exemption ....................................................................... 38
    16. Preservation of Causes of Action .......................................................... 39

E.  Treatment of Executory Contracts and Unexpired Leases.................................. 40
  1.  Assumption and Rejection of Executory Contracts and Unexpired Leases............................................................................................... 40
  2.  Indemnification Obligations ................................................................ 41
  3.  Claims Based on Rejection of Executory Contracts or Unexpired Leases............................................................................................... 41
  4.  Cure of Defaults for Assumed Executory Contracts and Unexpired Leases............................................................................................... 42
  5.  Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases .......................................................................... 43
  6.  Insurance Policies ................................................................................ 43
  7.  Reservation of Rights........................................................................... 44
  8.  Nonoccurrence of Effective Date.......................................................... 44
  9.  Contracts and Leases Entered Into after the Petition Date ..................... 44

F.  Provisions Governing Distributions...................................................................... 44
  1.  Distributions on Account of Claims Allowed as of the Effective Date .................................................................................................... 44
  2.  Disbursing Agent ................................................................................ 45
  3.  Rights and Powers of Disbursing Agent ................................................ 45
  4.  Delivery of Distributions and Undeliverable or Unclaimed Distributions........................................................................................ 45
  5.  Manner of Payment ............................................................................. 47
  6.  Exemption from Registration Requirements .......................................... 47
  7.  Compliance with Tax Requirements ...................................................... 47
  8.  Allocations .......................................................................................... 48
  9.  No Postpetition Interest on Claims ....................................................... 48
  10.  Foreign Currency Exchange Rate ......................................................... 48
  11.  Setoffs and Recoupment ...................................................................... 48
  12.  Claims Paid or Payable by Third Parties ............................................... 49

G.  Procedures for Resolving Contingent, Unliquidated, and Disputed Claims........ 49
  1.  Disputed Claims Process...................................................................... 49
  2.  Allowance of Claims............................................................................ 50
  3.  Claims Administration Responsibilities................................................. 50
  4.  Adjustment to Claims without Objection ............................................... 51
  5.  Disallowance of Claims or Interests ..................................................... 51
  6.  No Distributions Pending Allowance..................................................... 51
  7.  Distributions after Allowance .............................................................. 52

H.  Settlement, Release, Injunction, and Related Provisions..................................... 52
  1.  Discharge of Claims and Termination of Interests................................. 52
  2.  Release of Liens .................................................................................. 52
  3.  Releases by the Debtors ....................................................................... 53
  4.  Releases by the Releasing Parties (the "Third-Party Release")............... 54
  5.  Exculpation ......................................................................................... 55
  6.  Injunction ........................................................................................... 56

|   | 7. | Protections against Discriminatory Treatment | 57 |
|   | 8. | Waiver of Statutory Limitation on Releases | 57 |
|   | 9. | Reimbursement or Contribution | 57 |
|   | 10. | Integral Part of Plan | 57 |

I. Conditions Precedent to Confirmation and Consummation of the Plan ............. 58

|   | 1. | Condition Precedent to Confirmation | 58 |
|   | 2. | Conditions Precedent to the Effective Date | 58 |
|   | 3. | Waiver of Conditions | 60 |
|   | 4. | Effect of Failure of Conditions | 60 |
|   | 5. | Substantial Consummation | 60 |

J. Modification, Revocation, or Withdrawal of Plan ............................ 61

|   | 1. | Modification and Amendments | 61 |
|   | 2. | Effect of Confirmation on Modifications | 61 |
|   | 3. | Revocation, Withdrawal, and Voidance of Plan | 61 |

K. Retention of Jurisdiction ................................................ 61

L. Miscellaneous Provisions ................................................ 65

|   | 1. | Immediate Binding Effect | 65 |
|   | 2. | Additional Documents | 65 |
|   | 3. | Reservation of Rights | 65 |
|   | 4. | Successors and Assigns | 65 |
|   | 5. | Notices | 65 |
|   | 6. | Term of Injunctions or Stays | 66 |
|   | 7. | Entire Agreement | 66 |
|   | 8. | Exhibits and Annexes | 66 |
|   | 9. | Non-severability of Plan Provisions | 67 |
|   | 10. | Votes Solicited in Good Faith | 67 |
|   | 11. | Governing Law | 67 |
|   | 12. | Closing of Chapter 11 Cases | 68 |
|   | 13. | Waiver or Estoppel | 68 |

**VIII. LIQUIDATION ANALYSIS, VALUATION, AND FINANCIAL PROJECTIONS** ................................................ **68**

A. Liquidation Analysis ................................................ 68
B. Valuation Analysis ................................................ 68
C. Financial Projections ................................................ 69

**IX. CORPORATE GOVERNANCE** ................................................ **62**

A. New Organizational Documents ................................................ 62
B. Directors and Officers of the Reorganized Debtors ........................ 62

**X. FEASIBILITY AND BEST INTEREST OF THE CREDITORS** .................. **62**

A. Feasibility of the Plan ................................................ 62
B. Best Interests of Creditors Test ........................................ 62

XI.     CONFIRMATION PROCEDURES.................................................................................. 63

        A.      Confirmation Hearing ............................................................................... 63
        B.      Statutory Requirements for Confirmation of the Plan .......................... 63
                1.      Acceptance by Impaired Classes ................................................ 63
                2.      Confirmation Without Acceptance by All Impaired Classes ................. 64

XII.    RISK FACTORS ............................................................................................................ 65

        A.      Bankruptcy-Specific Considerations ...................................................... 65
                1.      General ......................................................................................... 65
                2.      Objections to the Plan's Classification of Claims and Interests ............. 65
                3.      Non-Confirmation or Delay of Confirmation of the Plan...................... 65
                4.      Non-Consensual Confirmation ................................................... 66
                5.      Non-Occurrence of the Effective Date....................................... 67
                6.      Conversion to Chapter 7 ............................................................ 67
                7.      Impact of Chapter 11 Cases on the Debtors............................. 67
                8.      Inability to Assume Executory Contracts ................................. 67
                9.      Votes and Recoveries Subject to Contingencies ..................... 68
                10.     Ability to Discharge or Satisfy Prepetition Claims.................. 68
                11.     Failure to Obtain Approval of Releases, Injunctions, and
                        Exculpation ................................................................................. 68
                12.     Plan Based on Assumptions ....................................................... 69

        B.      Risks Related to the Debtors' Business Operations and Financial Condition ..... 69
                1.      Substantial Leverage; Ability to Service Debt......................... 69
                2.      Restrictive Covenants in Exit Facilities Documents................ 70
                3.      Effect of Uncertainty on Contract Counterparties .................. 70
                4.      Adverse Impact of Prepetition and Postpetition Litigation.................... 70
                5.      Inability to Obtain Capital ......................................................... 71
                6.      Financial Projections................................................................... 71
                7.      Variance between Historical Performance and Future Performance
                        of Reorganized Debtors ............................................................. 71

        C.      Risks Related to the New Common Stock............................................... 72
                1.      Lack of Public Market or Valuation Analysis for Plan Securities .......... 72
                2.      Restrictions on Transfer .............................................................. 72
                3.      Potential for Dilution .................................................................. 73
                4.      Adverse Effects on Value of New Common Stock ................... 73

XIII.   CERTAIN SECURITIES LAW MATTERS................................................................. 73

        A.      Plan Securities............................................................................................. 73
        B.      Issuance and Resale of Plan Securities under the Plan ........................ 74
                1.      Exemptions from Registration Requirements of the Securities Act
                        and State Blue Sky Laws ............................................................. 74
                2.      Resales of Plan Securities; Definition of Underwriter............ 75

        3.       Resale of Other Securities Exempt from Registration Requirements Pursuant to Section 4(a)(2) of the Securities Act ..................................... 77

**XIV.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ....................................................................................................... **77**

    A.      Introduction ................................................................................................. 77
    B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ....... 78

        1.       Cancellation of Debt and Reduction of Tax Attributes ........................... 78
        2.       Limitation of Tax Attributes .................................................................. 78

    C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Claims ...................................................................................................... 81

        1.       General ................................................................................................. 81
        2.       Market Discount ................................................................................... 82
        3.       Definition of "Security" ........................................................................ 82
        4.       Bad Debt and/or Worthless Securities Deduction ................................... 82
        5.       Consequences to Holders that are Non-United States Persons ................ 83
        6.       Consequences to U.S. Holders of Ownership and Dispositions of Exit Facilities ...................................................................................... 84
        7.       Consequences to Non-U.S. Holders of Ownership and Dispositions of Exit Facilities .................................................................................. 84
        8.       Consequences to U.S. Holders of Ownership and Dispositions of New Common Stock .............................................................................. 86
        9.       Consequences to Non-U.S. Holders of Ownership and Dispositions of New Common Stock .......................................................................... 86
      10.     Withholding and Reporting ................................................................... 88
      11.     FATCA ................................................................................................ 88

    D.      Reservation of Rights ................................................................................... 89

317390990v1

## EXHIBITS

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Liquidation Analysis

EXHIBIT C    Financial Projections

EXHIBIT D    Valuation Analysis

> **THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

317390990v1

## I.     INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to Section 1125 of the Bankruptcy Code to Holders of Claims against the Debtors in connection with the solicitation of votes for acceptance of the Plan. A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference. Although administered jointly for procedural and administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. The Debtors seek to consummate the restructuring outlined in the Plan on the proposed Effective Date of the Plan. Each Debtor is a proponent of the Plan within the meaning of Section 1129 of the Bankruptcy Code. Unless otherwise indicated in a particular Class, the classification of Claims and Interests set forth in **Article III** of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as applicable. The Plan does not contemplate substantive consolidation of any of the Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST AVAILABLE RECOVERY TO ALL CREDITORS. AT THIS TIME, THE DEBTORS BELIEVE THE PLAN REPRESENTS THE BEST AVAILABLE OPTION FOR COMPLETING THE CHAPTER 11 CASES. THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    EXECUTIVE SUMMARY

The Debtors' Plan sets forth the manner in which Claims against and Interests in the Debtors will be treated following confirmation of the Plan. This Disclosure Statement, submitted pursuant to Section 1125 of the Bankruptcy Code for the purpose of soliciting votes to accept or reject the Plan, describes certain aspects of the Plan, the Debtors' business operations and financial projections, significant events occurring in the Debtors' Chapter 11 Cases, and related matters. This Executive Summary is intended solely as a summary. **FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS HERETO AND THERETO IN THEIR ENTIRETY**.

### A.     Preliminary Statement

The Debtors directly or indirectly own a 216-unit multifamily residential development in Bradenton, Florida, known as the Shoreview Waterfront Apartments (the "Property"). Debtors Shoreview Holding, PLF Shoreview, and MDW Shoreview (collectively, the "Mortgage Debtors") own the Property as tenants in common.  Specifically, Debtor Shoreview Holding holds a 95% ownership interest in the Property as tenant in common with the other Mortgage Debtors—each of which hold a 2.5% ownership interest in the Property.

The Property is managed by Resprop (the "Property Manager"). The Property Manager does not share common ownership or control with any of the Debtors and is not affiliated with any

1

of the Debtors.[3] The Property Manager also utilizes a variety of vendors and independent contractors to provide integral services for the benefit of the Property and the residents. Such services include maintenance and repairs, make-ready services for new residents, and sanitation and security services.

The Mortgage Debtors are all member-managed by Shoreview Mezz, PLF Mezz, and MDW Mezz (collectively, the "Mezzanine Debtors"), respectively. The Mezzanine Debtors are all non-member managed pursuant to the terms of their limited liability company agreements.

The Plan reflects the agreement reached between the Debtors and the Mezzanine Lender regarding the Debtors' treatment of the Mezzanine Loan Claim and the Debtors and the Mortgage Lender regarding the Debtors' treatment of the Mortgage Loan Claim. For the reasons detailed in this Disclosure Statement, the Debtors believe that the Plan provides for a comprehensive restructuring of the Debtors' capital structure, provides for fair and reasonable treatment of Holders of Claims and Interests, and is in the best interests of the Debtors, their Estates, and their creditors. Accordingly, the Debtors recommend that Holders of Claims and Interests support Confirmation of the Plan.

### B.    Overview of the Plan

The Plan contemplates the implementation of refinancing transactions and equity contributions that, together, satisfy a substantial portion of the Debtors' prepetition funded indebtedness, the payment in full of all Allowed General Unsecured Claims, and exit financing facilities, which collectively will result in a significantly deleveraged balance sheet and necessary liquidity for the Reorganized Debtors upon emergence. The compromises and settlements embodied in the Plan preserve value by enabling the Debtors to avoid costly and time-consuming litigation that would delay the Debtors' emergence from chapter 11. The key components of the Plan are described below.

### 1.    Restructuring Transactions

The key element of the Plan is the closing on Restructuring Transactions and utilizing funds generated from those transactions to indefeasibly pay in full in Cash the Allowed Mezzanine Loan Claim and the Allowed Mortgage Loan Claim. Specifically, if the Plan is confirmed, the Holder of the Mezzanine Loan Claim will receive the indefeasible payment in full in Cash of the Allowed Mezzanine Loan Claim and the Holder of the Mortgage Loan Claim will receive the indefeasible payment in full in Cash of the Allowed Mortgage Loan Claim. The Mortgage Lender shall apply the amounts held by it in the Cash Management Account, other amounts held by it in capital expenditure tax, and insurance reserves, and payments made to it on account of its Adequate Protection Claims to reduce the amounts due to it on account of its Allowed Mortgage Loan Claim.

---

[3] As stated in the *Declaration of Monte Lee-Wen in Support of Debtors' Petitions and First Day Pleadings* [Dkt. No. 10] (the "Lee-Wen Declaration" or "First Day Declaration"), the Property Manager employs all employees that work at and maintain the Property, and the Mortgage Debtors pay for the Property Manager's payroll for such employees.

**2.      Payment in Full of Allowed Administrative Expense, Other Secured, Priority, and General Unsecured Claims**

As set forth in more detail below and in the Plan, the Plan provides for the indefeasible payment in full in Cash of Allowed Administrative Expense Claims, Priority Tax Claims, Other Secured Claims, Other Priority Claims, and General Unsecured Claims or such other treatment that renders such claims Unimpaired (with the consent of the Exit Facility Lenders).

**3.      General Settlement of Claims and Interests**

As described more fully in the Plan, pursuant to Section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan will constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the Debtors.

**4.      Exit Facilities**

Unless the Debtors determine, in consultation with the Mortgage Lender and the Mezzanine Lender, that the pursuit of the Alternative Equity Restructuring is in the best interests of the Debtors' Estates and their stakeholders, on the Effective Date, the Reorganized Debtors shall enter into the Exit Facilities, the terms of which will be set forth in the Exit Facilities Documents and acceptable to the Debtors and Exit Facility Lenders.

In accordance with the terms and conditions set forth in the Exit Facilities Documents, and to the extent applicable, Confirmation of the Plan shall be deemed (a) an approval of the Exit Mezzanine Loan Agreement and Exit Mortgage Loan Agreement (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid (at any time) by the Debtors or the Reorganized Debtors, as applicable, in connection therewith and subject to all conditions set forth therein), to the extent not approved by the Bankruptcy Court previously, and (b) an authorization for the Debtors or the Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Mezzanine Loan Documents and Exit Mortgage Loan Documents and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to consummate the Exit Facilities.

**5.      Alternative Equity Restructuring**

Upon the Debtors' election to pursue the Alternative Equity Restructuring and Filing of the Alternative Equity Restructuring Notice, on the Effective Date, Reorganized Shoreview Holding LLC shall issue New Equity Interests in connection with the Alternative Equity Investment, pursuant to the Alternative Equity Restructuring.

In accordance with the terms and conditions set forth in the Definitive Documentation with respect to the Alternative Equity Investment, and to the extent applicable, Confirmation of the Plan shall be deemed (a) an approval of the Alternative Equity Investment (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be

incurred and fees paid (at any time) by the Debtors or Reorganized Shoreview Holding LLC, as applicable, in connection therewith and subject to all conditions set forth therein), to the extent not approved by the Bankruptcy Court previously, and (b) an authorization for the Debtors or Reorganized Shoreview Holding LLC, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Alternative Equity Investment and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors or Reorganized Shoreview Holding LLC, as applicable, may deem to be necessary to consummate the Alternative Equity Restructuring.

### 6. Releases and Injunctions

The Plan contains certain releases and injunctions (as described more fully in **Article IX** of the Plan), including releases between the Debtors and Reorganized Debtors, on the one hand, and certain Released Parties on the other hand. The Released Parties under the Plan include the Debtors, Reorganized Debtors, Pearlmark, Prime, each lender under the Exit Facilities and its members, and their representatives, advisors, Affiliates, and agents, including the Debtors current and former directors and officers. The Plan also provides that each Holder of a Claim or an Interest that does not make the opt-out election on its Ballot or form included with the notice of non-voting status, as applicable, and return such Ballot or form pursuant to the instructions set forth therein, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all claims and causes of action against the Released Parties. The applicable Ballot or election form included with a notice of non-voting status provide the instructions by which Holders of Claims or Interests as of the Voting Record Date may opt-out of granting the Third Party Release in the Plan. The release, exculpation, and injunction provisions in **Article VIII** of the Plan are integral to the Plan and the Debtors' restructuring efforts.

### C. Entitlement to Vote

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim you hold and whether you held that Claim as of the Voting Record Date (as defined below). Each category of Holders of Claims or Interests, as set forth in **Article III** of the Plan pursuant to Section 1122(a) of the Bankruptcy Code, is referred to as a "**Class**." Each Class's respective voting status is set forth below:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Mortgage Loan Claim | Unimpaired | Note Entitled to Vote (Deemed to Accept) |
| Class 4 | Mezzanine Loan Claim | Unimpaired | Note Entitled to Vote (Deemed to Accept) |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

| Class 6 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Deemed to Accept or Reject) |
| Class 7 | Existing Equity Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Existing Mezzanine Debtor Equity Interests | Unimpaired | Note Entitled to Vote (Deemed to Accept) |

### D. Plan Distributions

The following chart summarizes the projected distributions to Holders of Allowed Claims and Allowed Interests. Although every reasonable effort was made to be accurate, the projections of estimated recoveries are only an estimate. Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts Allowed by the Bankruptcy Court. As a result of the foregoing and other uncertainties which are inherent in the estimates, the estimated recoveries in this Disclosure Statement may vary from the actual recoveries received. In addition, the ability to receive distributions under the Plan depends on the ability of the Debtors to obtain Confirmation of the Plan and meet the conditions to confirmation and effectiveness of the Plan, as discussed in this Disclosure Statement. Reference should be made to the entire Disclosure Statement, including without limitation **Sections VII.A** and **B** of this Disclosure Statement, and the Plan for a complete description of the classification and treatment of Allowed Claims and Allowed Interests.

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims (approx.)** | **Projected Recovery** |
| N/A | General Administrative Expense Claims | Unless otherwise agreed to by the Holder of an Allowed General Administrative Expense Claim and, with the reasonable consent of the Exit Facility Lenders, the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed General Administrative Expense Claim will receive in full and final satisfaction of its General Administrative Expense Claim, at the option of the Debtors (with the consent of the Exit Facility Lenders), (A) an amount of Cash equal to the unpaid amount of such Allowed Administrative Expense Claim in accordance with the | Undetermined | 100% |

5

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (approx.) | Projected Recovery |
| | | following: (1) if an General Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (2) if such General Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such General Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed General Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Expense Claim without any further action by the Holders of such Allowed General Administrative Expense Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable; or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court or (B) such other treatment consistent with the | | |

317390990v1

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (approx.) | Projected Recovery |
| | | provisions of section 1129(a)(9) of the Bankruptcy Code. | | |
| N/A | Professional Claims | All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Administrative Expense Claims Bar Date. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Claim Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Claim Reserve Amount on the Effective Date. | Undetermined | 100% |
| N/A | Priority Tax Claims | Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors (with the consent of the Exit Facility Lenders) agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. | Undetermined | 100% |
| Class 1 | Other Secured Claims | Subject to **Article VIII** of the Plan, except to the extent that a Holder of | Undetermined | 100% |

7

| | SUMMARY OF EXPECTED RECOVERIES | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims (approx.)** | **Projected Recovery** |
| | | an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, on, or as soon as reasonably practicable after, the later of (i) the Effective Date if such Other Secured Claim is an Allowed Other Secured Claim as of the Effective Date or (ii) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor, in each case: (i) indefeasible payment in full in Cash of its Allowed Other Secured Claim; (ii) Reinstatement of its Allowed Other Secured Claim; or (iii) such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided, however*, that Other Secured Claims arising out of obligations incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | | |
| Class 2 | Other Priority Claims | Subject to **Article VIII** of the Plan, except to the extent that a Holder of an Allowed Other Priority Claim | Undetermined | 100% |

8

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims (approx.)** | **Projected Recovery** |
| | | against any of the Debtors has agreed to less favorable treatment of such Claim, on, or as soon as reasonably practicable after, the later of (i) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim as of the Effective Date or (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor, in each case: (i) indefeasible payment in full in Cash of its Allowed Other Priority Claim; (ii) Reinstatement of its Allowed Other Priority Claim; or (iii) such other treatment that renders its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided*, *however*, that Other Priority Claims arising out of obligations incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court. | | |
| Class 3 | Mortgage Loan Claim | On the Effective Date, the Debtors shall indefeasibly pay in full to the Mortgage Lender or its designee in Cash the Allowed Mortgage Loan | Not less than $53,561,174.34 as of the Petition Date, | 100% |

9

| SUMMARY OF EXPECTED RECOVERIES | | | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims (approx.)** | **Projected Recovery** |
| | | Claim in full and final satisfaction, compromise, settlement and release of such claim without avoidance, disallowance, recharacterization, subordination (whether equitable, contractual, or other otherwise), attachment, counterclaim, defense, impairment, Claim, offset, recoupment, reduction, deduction, or any other challenge of any kind by any Person or Entity.  The Mortgage Lender shall apply the amounts held by it in the Cash Management Account, other amounts held by it in capital expenditure tax, and insurance reserves, and payments made to it on account of its Adequate Protection Claims to reduce the amounts due to it on account of its Allowed Mortgage Loan Claim. Following The Debtors' indefeasible payment in full of the Allowed Mortgage Loan Claim, and only thereafter, shall the Mortgage Lender release all Liens securing the Mortgage Loan Claim, including, but not limited to, those Liens pursuant to the Mortgage Loan Documents. | plus postpetition interest at the default rate and all other fees, expenses and charges due under the Mortgage Loan Documents, Including without limitation the Mortgage Lender's prepetition and postpetition professional fees and expenses. | |
| Class 4 | Mezzanine Loan Claims | On or before the Payment Deadline (as defined in the Agreed Lift Stay Order) and subject to the same terms and conditions set forth in the Agreed Lift Stay Order, the Mezzanine Lender will receive indefeasible payment in full in Cash of its Allowed Mezzanine Loan | $13,664,126.37 | 100% |

10

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (approx.) | Projected Recovery |
| | | Claim in full and  final satisfaction, compromise, settlement and release of such claims without offset, recoupment, reductions, or deductions of any kind, and the Mezzanine Lender shall release all Liens securing the Mezzanine Loan Claims, including, but not limited to, those Liens pursuant to the Mezzanine Loan Documents, and release all claims against any guarantors under the Mezzanine Loan Documents. | | |
| Class 5 | General Unsecured Claims | The legal, equitable, and contractual rights of the Holders of General Unsecured Claims are unaltered by the Plan. On or as soon as practicable after the earliest to occur of the Effective Date and the date such Claim becomes due in the ordinary course of business, each Holder of an Allowed General Unsecured Claim shall receive indefeasible payment in full in Cash on account of its Allowed General Unsecured Claim or such other treatment as would render such Claim Unimpaired (in each case except to the extent that a holder of a General Unsecured Claim agrees to less favorable treatment with the prior written consent of the Exit Facility Lenders). | Undetermined | 100% |
| Class 6 | Intercompany Claims | On the Effective Date, each Intercompany Claim shall be, at the option of the applicable Debtor, either: (i)Reinstated on the | N/A | 100% / 0% |

11

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims (approx.) | Projected Recovery |
| | | Effective Date; or (ii) canceled, released, and extinguished, and will be of no further force or effect without any distribution. | | |
| Class 7 | Existing Mortgage Debtor Equity Interests | On the Effective Date, each of the Mortgage Debtors shall contribute 100% of their Existing Equity Interests to Reorganized Shoreview Holding, which shall be subject to dilution by the Equity Investment, and 100% of the respective interests in the Property to Reorganized Debtor Shoreview Holding. | N/A | N/A |
| Class 8 | Existing Mezzanine Debtor Equity Interests | On the Effective Date, each of the Mezzanine Debtors shall contribute 100% of their Existing Equity Interests to Shoreview JV LP, which shall be subordinate to the Equity Investment. | N/A | N/A |

## III.    INSTRUCTIONS AND PROCEDURES

On July 11, 2025, the Debtors filed a motion seeking the Bankruptcy Court to schedule a hearing to, among other things, (i) approve this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and interest holders to make an informed judgment whether to accept or reject the Plan, (ii) consider Confirmation of the Plan, and (iii) ratify the procedures for final approval of the Disclosure Statement, dissemination of the Combined Hearing Notice and Opt-Out Form, and setting the Confirmation Hearing with respect to the Plan (the "**Disclosure Statement Order**") (the "**Disclosure Statement Hearing**"). **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order will ratify the deadlines, procedures, and instructions for voting to accept or reject the Plan, if applicable, and for filing objections to Confirmation of the

Plan. Each Holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes.

### A. Holders of Claims Entitled to Vote

---

**NO CLASSES OF CLAIMS OR INTERESTS ARE IMPAIRED UNDER THE PLAN. ACCORDINGLY, EACH CLASS IS CONCLUSIVELY PRESUMED TO HAVE ACCEPTED THE PLAN PURSUANT TO SECTION 1126(F) OF THE BANKRUPTCY CODE.**

---

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or equity interests which (i) are "impaired" by a chapter 11 plan and (ii) are entitled to receive a distribution under such plan are entitled to vote to accept or reject a proposed plan. Classes of claims or equity interests which (a) are "impaired" by a chapter 11 plan and (b) are not entitled to receive a distribution under such a plan are not entitled to vote and are deemed to have rejected the Plan. Classes of Claims or Interests in which the Holders of Claims or Interests are unimpaired are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

No Classes of Claims or Interests are Impaired under the Plan. Accordingly, each Class is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

As no Classes of Claims or Interests are Impaired under the Plan, section 1129(a)(10) of the Bankruptcy Code is in applicable for the purposes of Confirmation. The Debtors reserve the right to modify the Plan in accordance with Article XI therein to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are Impaired, the Court shall, after notice and a hearing, determine such controversy on or before Confirmation.

### B. Confirmation Hearing

Pursuant to Section 1128 of the Bankruptcy Code, the Debtors will request that the Bankruptcy Court hold the Confirmation Hearing to consider Confirmation of the Plan on July 22, 2025. The Debtors will request that the Bankruptcy Court direct that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before **July 21, 2025 at 4:00 p.m.** (prevailing Central Time) (the "**Objection Deadline**"). The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

### C. Notice of Confirmation

Holders of Claims or Interests not entitled to vote to accept or reject the Plan will receive a notice of the hearing to consider the final approval of the Disclosure Statement and Confirmation of the Plan (the "**Combined Hearing Notice**"), which notice will provide such Holder with

information regarding (i) how to obtain copies of this Disclosure Statement, the Plan, and other documents, (ii) the Confirmation Hearing, (iii) the Objection Deadline, and (iv) the releases and injunctions provided for in **Article VIII** of the Plan, and the procedures by which such Holders may elect to opt-out of granting certain releases.

### D.    Agreements upon Furnishing Ballots

The delivery of an accepting Ballot by a Holder pursuant to one of the procedures set forth above will constitute the agreement of such Holder to accept (i) all of the terms of, and conditions to, the solicitation and voting procedures and (ii) the terms of the Plan, but subject to rights of such Holder under Section 1128 of the Bankruptcy Code.

## IV.    GENERAL INFORMATION ABOUT THE DEBTORS

### A.    Overview and Operations

The Debtors directly or indirectly own a 216-unit multifamily residential development in Bradenton, Florida, known as the Shoreview Waterfront Apartments. The Mortgage Debtors (*i.e.*, Shoreview Holding, PLF Shoreview, and MDW Shoreview) own the Property as tenants in common.

The Property Manager (*i.e.*, Resprop), does not share common ownership or control with any of the Debtors and is not affiliated with any of the Debtors.  The Property Manager also utilizes a variety of vendors and independent contractors to provide integral services for the benefit of the Property and the residents. Such services include maintenance and repairs, make-ready services for new residents, and sanitation and security services.  Asset management services for the Property are also provided by Casoro Group LLC "Casoro") in exchange for a monthly fee. Casoro is indirectly affiliated with certain investors of the sole member of the Debtor Shoreview Apartments LLC.

The Mortgage Debtors are all member-managed by the Mezzanine Debtors (*i.e.*, Shoreview Mezz, PLF Mezz, and MDW Mezz), each respectively holding the single membership interest in each of the Mortgage Debtors pursuant to the terms of their limited liability company agreements. The Mezzanine Debtors, in turn, are all non-member managed pursuant to the terms of their limited liability company agreements and Mr. Monte Lee-Wen became the manager of the Mezzanine Debtors as of December 2024.  are all non-member managed pursuant to the terms of their limited liability company agreements.

Each of the Debtors also have an independent manger (the "Independent Manager") appointed under the terms of their limited liability company agreements.  The Independent Manager, Anthony Shippam, is not affiliated in any way with any of the Debtors and is wholly independent from the Debtors' ownership structure.

An organization chart reflecting the Debtors' pre-petition ownership structure appears immediately below:



As detailed herein and in the First Day Declaration, the Company's prior management was not providing adequate value addition, performance maximization and fundraising efforts. These shortfalls, coupled with an increasingly challenging interest rate environment and macro-economic headwinds, among other factors, led the Company to initiating these Chapter 11 Cases. The proposed restructuring transactions described herein and the related chapter 11 process will prove transformative—and is expected to allow the Company to go forward with the ability to compete successfully in the current economic environment while maintaining stability to the Property's tenants.

### B. The Debtors' Prepetition Capital Structure

As of the Petition Date, the Debtors have approximately $64.6 million in total funded secured debt obligations. The approximate outstanding principal amounts and collateral of the existing secured debt obligations are as follows:

| Funded Secured Debt | Maturity | Outstanding Principal Amount | Collateral |
|---|---|---|---|
| Mezzanine Loan | January 9, 2025 | Approx. $13.5 million | Liens against the Mezzanine Debtors' respective equity interests in the Mortgage Debtors. |
| Mortgage Loan | January 9, 2025 | Approx. $51.1 million | Liens against the Property, among other things, rents and proceeds, and the Mortgage Debtors' cash. |
| **Total Funded Secured Debt** | | **$64.6 million** | |

### 1. Mezzanine Loan

The Mezzanine Debtors entered into certain financing documents with Pearlmark, including that certain "Loan Agreement" dated as of December 15, 2021 (the "Mezzanine Loan

15

Agreement") and other related documents and agreements (together with the Mezzanine Loan Agreement, the "Mezzanine Loan Documents"). The Mezzanine Loan Documents provide Pearlmark with a lien against the Mezzanine Debtors' respective equity interests in the Mortgage Debtors.

Pearlmark does not have a security interest in any Cash Collateral held by the Mortgage Debtors. Under the Mezzanine Loan Agreement, Pearlmark provided financing to the Mezzanine Debtors in the original principal amount of $13.5 million.

The Mezzanine Loan's initial maturity date was January 9, 2024, but the Mezzanine Debtors exercised certain rights under the Mezzanine Loan Agreement to extend the maturity date to January 9, 2025.

### 2.      Mortgage Loan

The Mortgage Debtors entered into certain loan and financing documents with their senior secured lender, Prime, including that certain "Loan Agreement" dated as of December 15, 2021 and other related documents and agreements, including a mortgage secured by the Property and assignment of rents. The Mortgage Loan Documents provide Prime with a lien against, inter alios, the Property, rents and proceeds, and the Mortgage Debtors' cash (the "Cash Collateral") among other items (collectively, the "Collateral"). Under the Mortgage Loan Documents, Prime provided financing to the Mortgage Debtors in the original principal amount of $51.1 million (the "Mortgage Loan" and together with the Mezzanine Loan, the "Loans").

The Mortgage Loan's initial maturity date was January 9, 2024, but the Mortgage Debtors exercised certain rights under the Mortgage Loan Documents to extend the maturity date to January 9, 2025. The Mortgage Debtors, however, did not timely further extend the January 9, 2025 maturity date. Pursuant to the Cash Collateral Order and the Plan, the Debtors stipulate and agree that the Mortgage Lender's Allowed Mortgage Loan Claim is in an amount of not less than $53,561,174.34 as of the Petition Date, plus postpetition interest at the default rate and all other fees, expenses and charges due under the Mortgage Loan Documents, including without limitation the Mortgage Lender's prepetition and postpetition professional fees and expenses.

### 3.      Trade and Related Debt

As of the Petition Date, the Debtors estimate that they have approximately $200,000 in obligations to trade and other general unsecured creditors. These amounts consist primarily of accounts payable and accrued obligations to various trade creditors, utility providers, and other third-party service providers.

### 4.      Personal Guarantees

There are several personal guarantees granted by persons as security for the obligations owed to Prime and Pearlmark (collectively, the "Pre-petition Lenders"). Mr. Monte Lee-Wen is a guarantor for the Mortgage Loan as well as the individual members of PLF Mezz and MDW Mezz. The individual members of PLF Mezz and MDW Mezz are also guarantors of the Mezzanine Loan along with four other individuals that do not include Mr. Monte Lee-Wen.

16

5.      **Equity Interests**

As of the Petition Date, pre-petition equity investors in the Debtors and their upstream indirect owners have also obtained in excess of $10 million in equity investments and/or member loans to fund the acquisition and operations of the Property.

On or about September 30, 2024, each of the members of PLF Mezz and MDW Mezz agreed by corporate resolution to, among other things, subordinate the right to any distributions to the return of any new capital invested.

## V.      CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11 CASES

### A.      Prior Management and Economic Headwinds

The Debtors' financial distress arises primarily from both Loans maturing on January 9, 2025, as well as certain of prior management's performance and other macroeconomic conditions.

Regarding prior management's performance, various upstream indirect investors in the Debtors reached the conclusion that prior management was not providing adequate value addition, performance maximization, and fundraising efforts (given the Loans' January 9, 2025 maturities). In December 2024, members of all of the Mezzanine Debtors executed appropriate consents and resolutions to remove the former non- member managers of the Mezzanine Debtors and replace them with Mr. Monte Lee-Wen. The members of the Mezzanine Debtors also authorized Mr. Lee-Wen to perform certain refinancing and recapitalization efforts for all of the Debtors and to achieve a comprehensive restructuring of the Debtors to accommodate new equity investment (collectively, the "Pre-Petition Restructuring Transactions").

Following Mr. Lee-Wen's appointing in December 2024, he and his team achieved and implemented operational and cost-reducing efficiencies for the operations and management of the Property—each of which showed improved near-term economic results.

However, the maturity of the Loans was also a precursor to the Chapter 11 Cases. Both the Mortgage Loan and the Mezzanine Loan contained optional extension options for the year-long period following January 9, 2025. The extension options are at the respective borrowing Debtors' sole election provided that certain condition are satisfied. The Mortgage Debtors, however, failed to satisfy one or more of the conditions required for such an extension.

Neither was an extension of the Mezzanine Loan obtained. Consequently, both Loans matured by their own terms on January 9, 2025. Prior to the Loans' maturities, the Debtors had not defaulted on their payment obligations under the Loans.

The increased interest rate environment made seeking alternative refinancing arrangements on the short time table demanded by the Illinois Chancery Lawsuit (defined below) extremely challenging.

17

B.     **The Chancery Proceedings and Pre-Petition Restructuring Transactions**

Following the Mezzanine Loan's maturity, Pearlmark notified the Mezzanine Debtors of Pearlmark's intention to conduct a public sale of the equity interests of the Mortgage Debtors on April 24, 2025 pursuant to Illinois law. The Mezzanine Debtors subsequently commenced a legal proceeding against Pearlmark in the Circuit Court of Cook County, Illinois, County Department, Chancery Division, assigned Case No. 2025-CH-04448 (the "Illinois Chancery Lawsuit") concerning Pearlmark's wrongful and commercially unreasonable online, public foreclosure auction of the Mezzanine Debtors' ownership interests in the Mortgage Debtors. The Mezzanine Debtors sought a temporary restraining order ("TRO") against Pearlmark in the Illinois Chancery Lawsuit, but the TRO request was denied on the morning of April 24, 2025. The Illinois Chancery Lawsuit remains pending, stayed by the commencement of these Chapter 11 Cases.

Prior to the Loans' maturity dates, Mr. Lee-Wen and other investors in the Debtors undertook extensive efforts to obtain re-financing of the Loans. The Mortgage Debtors had obtained a signed, non-binding term sheet from a lender concerning the refinancing of the Mortgage Loan, but the proceeds contemplated by the re-financing term sheet would have been insufficient to repay the Mortgage Loan Claim in full. The Mezzanine Debtors had also obtained a signed, non-binding term sheet from a different lender concerning the refinancing of the Mezzanine Loan, and again, the proceeds contemplated by the re-financing term sheet would have been insufficient to repay the Mezzanine Loan Claim in full. Due to the nature of the various refinancing term sheets that the Debtors had obtained, additional equity was required to pay off the Loans in full.

The Debtors may have obtained the necessary commitments to refinance the Loans and pay off Prime and Pearlmark, and to recapitalize and restructure the Debtors as part of the Pre-Petition Restructuring Transactions. The Debtors also believe that equity exists and will exist in the Property to support completion of the Restructuring Transactions contemplated pursuant to the Plan.

Simply, the Debtors needed more time to complete the Pre-Petition Restructuring Transaction than Pearlmark was willing to give. Accordingly, to preserve the progress made toward the Pre-Petition Restructuring Transactions that would have been harmed through Pearlmark's private sale of the equity interests in the Mortgage Debtors, preserve going concern value, and afford sufficient time to complete and close the Restructuring Transactions, the Debtors filed these Chapter 11 Cases on the Petition Date.

C.     **Strategic Alternatives**

1.     **Restructuring Terms**

Acting on behalf of the Company, Troutman Pepper Locke LLP engaged with Pre-petition Lenders and counsel to the Exit Facility Lenders, providing them with certain diligence materials and otherwise negotiating with the Pre-petition Lenders and Exit Facility Lenders to create a path forward for a reorganization.

18

Following extensive, arms'-length and good-faith negotiations, the Debtors formulated their Plan, which provides the Debtors with valuable optionality to maximize recovery and value to its stakeholders. The Plan contemplates the entry of the Reorganized Debtors in the Exit Facilities under the Exit Facility Restructuring or, at the election of the Debtors, in the alternative, entry into the Alternative Equity Restructuring. The Alternative Equity Restructuring contemplates the Alternative Equity Investment and no additional funded debt. Under each of the potential Restructuring Transactions, adequate capital will be provided to refinance and indefeasibly pay in full in Cash the Allowed Mezzanine Loan Claim and the Allowed Mortgage Loan Claim. The Exit Facility Lenders agreed with the Company to treat all unsecured claims as unimpaired under the Bankruptcy Code and for the Company to maintain a robust fiduciary out until approval of the Plan.

The Reorganized Debtors will be funded by (1) cash on hand, including Cash from operations and Cash in the Cash Management Account and in insurance, tax, and capital expenditure reserves held by the Mortgage Lender pursuant to the Mortgage Loan Documents and (2) proceeds from the Restructuring Transaction.

The Debtors are seeking confirmation of the Plan with the goal of emerging from Chapter 11 by July 23, 2025. Should the Debtors fails to close the Exit Facilities and indefeasibly pay in full the Allowed Mortgage Loan Claim and the Allowed Mezzanine Loan Claim pursuant to the terms of the Plan on or before July 23, 2025, the Bankruptcy Code's automatic stay will be lifted and Pearlmark will proceed with its foreclosure sale of the Mezzanine Debtors' equity interests in the Mortgage Debtors.

## VI.  CHAPTER 11 CASES

### A.  Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Chapter 11 authorizes a debtor to reorganize its business for the benefit of its creditors, equity interest holders, and other parties in interest. Commencing a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The principal objective of a chapter 11 case is to consummate a plan of reorganization. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court binds a debtor, any issuer of securities thereunder, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity the bankruptcy court may find to be bound by such plan. Chapter 11 requires that a plan treat similarly situated creditors and similarly situated equity interest holders equally, subject to the priority provisions of the Bankruptcy Code.

Subject to certain limited exceptions, the bankruptcy court order confirming a plan of reorganization discharges a debtor from any debt that arose prior to the date of confirmation of the plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

Prior to soliciting acceptances of a proposed plan of reorganization, Bankruptcy Code Section 1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan of reorganization. This Disclosure Statement is submitted in accordance with Bankruptcy Code Section 1125.

## B. Administration of these Chapter 11 Cases

### 1. First Day Motions

On the Petition Date, or soon thereafter, the Debtors filed numerous first-day motions (the "**First Day Motions**"), the object of which is to streamline the transition to operating under chapter 11, to stabilize operations, and to preserve their relationships with key contractual parties and other key constituencies. The First Day Motions requested, among other things, authority to:

(i) jointly administer the Chapter 11 Cases for procedural purposes only;

(ii) continue to operate the Debtors' existing cash management system and continue the use of existing bank accounts and business forms;

(iii) continue the use of the Debtors' Cash Collateral;

(iv) pay certain critical vendors; and

(v) continue to pay for utility services.

### 2. Proposed Confirmation Schedule

It is imperative that the Debtors proceed swiftly to confirmation of the Plan and emergence from these Chapter 11 Cases to mitigate uncertainty among tenants of the Property, and vendors, minimize disruptions to the Company's business, and curtail professional fees and administrative costs. Expeditious confirmation of the Plan and consummation of the Restructuring Transactions is in the best interests of the Debtors, their Estates, and their stakeholders. The Debtors have proposed the following key case dates, subject to Court approval and availability:

| Event | Date |
|---|---|
| Voting Record Date | July 1, 2025 |
| Disclosure Statement Hearing | July 14, 2025 |
| Voting Deadline | July 21, 2025 at 4:00 p.m. (CT) |
| Plan Supplement Deadline | Two (2) business days prior to the Confirmation Hearing. |
| Objection Deadline | July 21, 2025 at 4:00 p.m. (CT) |
| Confirmation Materials Deadline | July 21, 2025 |
| Confirmation Hearing | July 22, 2025 at 3:30 p.m. (CT). |
| Opt-Out Deadline | August 4, 2025 at 4:00 p.m. (CT) |

### C. Preference and Other Potential Avoidance Actions

The Bankruptcy Code preserves the Debtors' rights to prosecute claims and Causes of Action which exist outside of bankruptcy, and also empowers the Debtors to prosecute certain claims that are established by the Bankruptcy Code, including claims to avoid and recover preferential transfers and fraudulent conveyances. The Plan provides that on the Effective Date, the Debtors will release all preference claims under section 547(b) of the Bankruptcy Code; however the Debtors will retain all other Causes of Action that are not released under Section VIII of the Plan.

### D. Other Litigation Matters

In the ordinary course of business, the Debtors are parties to a number of lawsuits, legal proceedings, and collection proceedings arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and collection proceedings.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, although a debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, here the following currently stayed matters are expected to ride through the Chapter 11 Cases and continue on against the Reorganized Debtors after the Effective Date.

Active Litigation Matters

- Mezzanine Debtors against Pearlmark, pending before the Circuit Court of Cook County, Illinois, County Department, Chancery Division, assigned Case No. 2025-CH-04448.

### E. Assumption and Rejection of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors are party to a number of Executory Contracts and Unexpired Leases. The Debtors, with the assistance of their advisors, are in the process of reviewing the Executory Contracts and Unexpired Leases to identify the contracts and leases to either assume or reject (with the consent of the Exit Facility Lenders) pursuant to Sections 365 and 1123 of the Bankruptcy Code. If any Executory Contracts or Unexpired Leases are rejected, any resulting Allowed rejection damages Claims will be treated as Allowed General Unsecured Claims.

The Plan provides that any Executory Contracts and Unexpired Leases that are not rejected during the Chapter 11 Cases or as part of the Plan will be assumed by the Reorganized Debtors. The Debtors may elect to file additional discrete motions seeking to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases.

F.     **Exclusivity**

The Debtors have the exclusive right to file a plan in these Chapter 11 Cases until August 22, 2025, and the exclusive right to solicit acceptances of such plan until October 21, 2025. As there is always a possibility that Confirmation of the Plan will not occur, the Debtors reserve their rights to seek extension of the exclusivity periods.

G.     **The Cash Collateral Order and the Agreed Lift Stay Order**

On May 28, 2025, the Bankruptcy Court entered the Cash Collateral Order, pursuant to which the Mortgage Lender agreed to allow the Debtors to use Cash Collateral in exchange for which the Debtors promised to, among other things, have (a) by no later than June 9, 2025, secured and shared with the Mortgage Lender binding written commitments for loans, equity contributions, or a combination thereof that would, in the aggregate (and when combined with the approximately $1.69 million in cash in the Cash Management Account and any other amounts held by the Mortgage Lender in capital expenditure, tax and insurance reserves), proceeds sufficient to satisfy the Loan Obligations, and (b) by no later than June 23, 2025, funded and paid the Loan Obligations. The Debtors did not secure binding written commitments to repay the Loan Obligations by the June 9 deadline nor did they fund and pay the Loan Obligations on or before June 23. Accordingly, the Debtors breached the Cash Collateral Order and the Mortgage Lender may send a Termination Notice (as defined in the Cash Collateral Order) at any time regarding the Debtors' use of Cash Collateral.

The Bankruptcy Court also entered the Agreed Lift Stay Order to addresses Pearlmark's lift stay motion. *See* ECF Nos. 55, 76. Pursuant to the Agreed Lift Stay Order, Pearlmark agreed to accept the indefeasible payment of $13,664,126.37 (the "Pearlmark Payment Amount") in full and final satisfaction of the debt arising under the Mezzanine Loan Documents, provided that, among other things, Pearlmark receives the Pearlmark Payment Amount on or before July 23, 2025.

If the Pearlmark Payment Amount is not received by Pearlmark on or before the Payment Deadline with all of the payment conditions set forth in the Agreed Lift Stay Order having been timely satisfied, including without limitation the indefeasible payment in full of the Mortgage Loan Claim, the automatic stay of 11 U.S.C. § 362 shall immediately and automatically terminate as to Pearlmark and the Mezzanine Loan without further order of the Bankruptcy Court as of the date immediately following the Payment Deadline. Pearlmark shall be authorized to exercise all of its available remedies and to enforce its rights under the Mezzanine Loan Documents, including, without limitation, proceeding with a foreclosure on the Mezzanine Collateral (as defined in the Agreed Lift Stay Order), and the Debtors shall be enjoined from taking any action to interfere with or contest the validity of Pearlmark's exercise of such rights and remedies.

**VII.   PLAN OF REORGANIZATION**

A.     **Administrative Expense Claims and Priority Claims**

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims, Professional Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in **Article III** of the Plan.

1.     **General Administrative Expense Claims**

Unless otherwise agreed to by the Holder of an Allowed General Administrative Expense Claim and, with the reasonable consent of the Exit Facility Lenders, the Debtors or the Reorganized Debtors, as applicable, each Holder of an Allowed General Administrative Expense Claim will receive in full and final satisfaction of its General Administrative Expense Claim, at the option of the Debtors (with the consent of the Exit Facility Lenders), (A) an amount of Cash equal to the unpaid amount of such Allowed Administrative Expense Claim in accordance with the following: (1) if an General Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed General Administrative Expense Claim is due or as soon as reasonably practicable thereafter); (2) if such General Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such General Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (3) if such Allowed General Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Expense Claim without any further action by the Holders of such Allowed General Administrative Expense Claim; (4) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as applicable (with the reasonable consent of the Required Consenting Lenders); or (5) at such time and upon such terms as set forth in an order of the Bankruptcy Court or (B) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

2.     **Professional Claims**

(a)     **Final Fee Applications and Payment of Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Effective Date must be Filed no later than the Administrative Expense Claims Bar Date. The Reorganized Debtors shall pay Professional Claims in Cash in the amount the Bankruptcy Court allows, including from the Professional Claim Escrow Account, which the Reorganized Debtors will establish in trust for the Professionals and fund with Cash equal to the Professional Claim Reserve Amount on the Effective Date.

(b)     **Professional Claim Escrow Account**

On the Effective Date, the Reorganized Debtors shall fund the Professional Claim Escrow Account with Cash equal to the aggregate Professional Claim Reserve Amount for all Professionals. The Professional Claim Escrow Account shall be maintained in trust for the Professionals. Such funds in the Professional Claim Escrow Account shall not constitute property of the Debtors' Estates or property of the Reorganized Debtors, except as otherwise expressly set forth in the last sentence of this paragraph. The amount of Professional Claims owing to the Professionals on and after the Effective Date shall be paid in Cash to such Professionals from funds held in the Professional Claim Escrow Account, without interest or other earnings therefrom, as soon as reasonably practicable after such Claims are Allowed by a Bankruptcy Court order. When

23

all Allowed Professional Claims have been indefeasibly paid in full, amounts remaining in the Professional Claim Escrow Account, if any, shall revert to the Reorganized Debtors.

### (c)  Professional Claim Reserve Amount

Professionals shall reasonably estimate their unpaid Professional Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than five days before the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of each Professional's final request for payment in the Chapter 11 Cases. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

### (d)  Post-Confirmation Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors or Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors or Reorganized Debtors. Upon the Effective Date, any requirement that Professionals comply with Sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.  Payment of Restructuring Expenses

Prior to or on the Effective Date, in the case of an Exit Facility Restructuring, the Debtors shall promptly and indefeasibly  pay in in full in Cash any and all accrued but unpaid reasonable fees and expenses of the Exit Facility Lenders for which the Debtors have received invoices or estimates prior to the Effective Date (in each case whether accrued prepetition or postpetition and to the extent not otherwise paid during the Chapter 11 Cases) without application by any such parties to the Bankruptcy Court, and without notice and a hearing, pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise. Following the Effective Date, the Reorganized Debtors shall pay the reasonable fees and expenses of the Exit Facility Lenders, in the case of an Exit Facility Restructuring, in the ordinary course of business for all reasonable and documented fees incurred in connection with the Chapter 11 Cases, the Plan and the Restructuring Transactions, including the implementation and consummation thereof, without further Bankruptcy Court order.

### 4.  Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtors (with the consent of the Exit Facility Lenders) agree to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in Section 1129(a)(9)(C) of the Bankruptcy Code.

### 5. Statutory Fees

All fees payable pursuant to section 1930(a) of the chapter 123 of title 28 of the United States Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each of the Reorganized Debtors (or the Disbursing Agent on behalf of each of the Reorganized Debtors) for each quarter (including any fraction thereof) until the earlier of entry of a final decree closing such Chapter 11 Cases or an order of dismissal or conversion, whichever comes first.

### B. Classification and Treatment of Claims and Interests

### 1. Classification of Claims and Interests

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation, and distribution pursuant thereto and pursuant to Sections 1122 and 1123(a) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class for purposes of distribution only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date. In accordance with Section 1123(a)(1) of the Bankruptcy Code and as described in **Article II** of the Plan, the Debtors have not classified Administrative Expense Claims and Priority Tax Claims.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Mortgage Loan Claim | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 4 | Mezzanine Loan Claim | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 5 | General Unsecured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 6 | Intercompany Claims | Impaired/ Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 7 | Existing Mortgage Debtor Equity Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 8 | Existing Mezzanine Debtor Equity Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

## 2.      Treatment of Claims and Interests

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable. Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.      Class 1 – Other Secured Claims

(a)      *Classification*: Class 1 consists of all Other Secured Claims.

(b)      *Treatment*: Subject to Article VIII hereof, except to the extent that a Holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, on, or as soon as reasonably practicable after, the later of (i) the Effective Date if such Other Secured Claim is an Allowed Other Secured Claim as of the Effective Date or (ii) the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor, in each case:

(i)      indefeasible payment in full in Cash of its Allowed Other Secured Claim;

(ii)      Reinstatement of its Allowed Other Secured Claim; or

(iii)      such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided*, *however*, that Other Secured Claims arising out of obligations incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(c)      *Voting*: Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.      Class 2 – Other Priority Claims

(a)      *Classification*: Class 2 consists of all Other Priority Claims.

(b)      *Treatment*: Subject to Article VIII hereof, except to the extent that a Holder of an Allowed Other Priority Claim against any of the Debtors has agreed

26

to less favorable treatment of such Claim, on, or as soon as reasonably practicable after, the later of if such (i) the Effective Date if such Other Priority Claim is an Allowed Other Priority Claim as of the Effective Date or (ii) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor, in each case:

(i)      indefeasible payment in full in Cash of its Allowed Other Priority Claim;

(ii)     Reinstatement of its Allowed Other Priority Claim; or

(iii)    such other treatment that renders its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code; *provided*, *however*, that Other Priority Claims arising out of obligations incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such applicable Debtor or Reorganized Debtor in accordance with the terms and conditions of any agreements relating thereto without further notice to or order of the Bankruptcy Court.

(c)     *Voting*: Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.     Class 3 – Mortgage Loan Claim

(a)     *Classification*: Class 3 consists of the Mortgage Loan Claim.

(b)     *Allowance*: As of the date hereof, pursuant hereto and the Cash Collateral Order, the Mortgage Lender shall have an Allowed Claim, without avoidance, disallowance, recharacterization, subordination (whether equitable, contractual, or otherwise), attachment, counterclaim, defense, impairment, Claim, offset, recoupment, reduction, deduction or any other challenge of any kind by any Person or Entity, against the Debtors' estate, in the amount of the Mortgage Loan Claim, including without limitation postpetition interest on such Claim at the default rate plus all other fees, expenses and charges due under the Mortgage Loan Documents, including without limitation the Mortgage Lender's prepetition and postpetition professional fees and expenses.

*Treatment*: On the Effective Date, the Debtors shall indefeasibly pay in full to the Mortgage Lender or its designee in Cash the Allowed Mortgage Loan Claim in full and final satisfaction, compromise, settlement and release of such claim without avoidance, disallowance, recharacterization, subordination (whether equitable, contractual, or otherwise), attachment, counterclaim, defense, impairment, Claim, offset, recoupment, reduction, deduction or

27

any other challenge of any kind, by any Person or Entity. The Mortgage Lender shall apply the amounts held by it in the Cash Management Account, other amounts held by it in capital expenditure tax, and insurance reserves, and payments made to it on account of its Adequate Protection Claims to reduce the amounts due to it on account of its Allowed Mortgage Loan Claim. Following the Debtors' indefeasible payment in full of the Allowed Mortgage Loan Claim, and only thereafter, shall the Mortgage Lender release all Liens securing the Mortgage Loan Claim, including, but not limited to, those Liens pursuant to the Mortgage Loan Documents.

(c)     *Voting*: Class 3 is Unimpaired under the Plan. Holders of Claims in Class 3 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

4.     Class 4 – Mezzanine Loan Claims

(a)     *Classification*: Class 4 consists of all Mezzanine Loan Claims.

(b)     *Allowance*: As defined in the Agreed Lift Stay Order and subject to the same terms and conditions set forth in the Agreed Lift Stay Order, the Mezzanine Loan Claim shall be Allowed without offset, recoupment, reductions, or deductions of any kind in the amount of $13,664,126.37, without any accrued and unpaid interest payable, fees, or costs on such amounts through the date that each Holder of an Allowed Mezzanine Loan Claim receives the treatment provided under the Plan.

(c)     *Treatment*: On or before the Payment Deadline (as defined in the Agreed Lift Stay Order) and subject to the same terms and conditions set forth in the Agreed Lift Stay Order, the Mezzanine Lender will receive indefeasible payment in full in Cash of its Allowed Mezzanine Loan Claim in full and final satisfaction, compromise, settlement and release of such claims without offset, recoupment, reductions, or deductions of any kind, and the Mezzanine Lender shall release all Liens securing the Mezzanine Loan Claims, including, but not limited to, those Liens pursuant to the Mezzanine Loan Documents, and release all claims against any guarantors under the Mezzanine Loan Documents.

(d)     *Voting*: Class 4 is Unimpaired under the Plan. Holders of Claims in Class 4 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

5.     Class 5 – General Unsecured Claims

(a)     *Classification*: Class 5 consists of all General Unsecured Claims against the Debtors.

(b)  *Treatment*: The legal, equitable, and contractual rights of the Holders of General Unsecured Claims are unaltered by the Plan. On or as soon as practicable after the earliest to occur of the Effective Date and the date such Claim becomes due in the ordinary course of business, each Holder of an Allowed General Unsecured Claim shall receive indefeasible payment in full in Cash on account of its Allowed General Unsecured Claim or such other treatment as would render such Claim Unimpaired (in each case except to the extent that a holder of a General Unsecured Claim agrees to less favorable treatment with the prior written consent of the Exit Facility Lenders).

(c)  *Voting*: Class 5 is Unimpaired under the Plan. Holders of Claims in Class 5 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

6.  Class 6 – Intercompany Claims

(a)  *Classification*: Class 6 consists of all Intercompany Claims.

(b)  *Treatment*: On the Effective Date, each Intercompany Claim shall be, at the option of the applicable Debtor, either:

(i)  Reinstated on the Effective Date; or

(ii)  canceled, released, and extinguished, and will be of no further force or effect without any distribution.

(c)  *Voting*: Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Intercompany Claims against the Debtors are not entitled to vote to accept or reject the Plan.

7.  Class 7 – Existing Equity Interests

(a)  *Classification*: Class 7 consists of all Existing Equity Interests.

(b)  *Treatment*: On the Effective Date, each of the Mortgage Debtors shall contribute 100% of their Existing Equity Interests to Reorganized Shoreview Holding, which shall be subject to dilution by the Equity Investment, and 100% of the respective interests in the Property to Reorganized Debtor Shoreview Holding.

(c)  *Voting*: Class 7 is Unimpaired under the Plan. Holders of Claims in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

8.  Class 8 – Existing Mezzanine Debtor Equity Interests

(a)     *Classification*: Class 8 consists of all Existing Mezzanine Debtor Equity Interests.

(b)     *Treatment*: On the Effective Date, each of the Mezzanine Debtors shall contribute 100% of their Existing Equity Interests to Shoreview JV LP, which shall be subordinate to the Equity Investment.

(c)     *Voting*: Class 8 is Unimpaired under the Plan. Holders of Claims in Class 8 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

### 3.     Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) regarding any Unimpaired or Reinstated Claim, including, without limitation, all rights regarding legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired or Reinstated Claim.

### 4.     Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to Section 1129(a)(8) of the Bankruptcy Code.

### 5.     Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 6.     Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests (as applicable) and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Allowed Interest (as applicable) in accordance with any contractual, legal, or equitable subordination relating thereto.

### 7.     Discharge of Claims

Pursuant to section 1141(c) of the Bankruptcy Code, all Claims and Interests that are not expressly provided for and preserved herein (or in any contract, instrument, release or other

agreement or document created pursuant to the Plan) shall be discharged and extinguished upon the Effective Date, and the Debtors and all property dealt with herein shall be free and clear of all such Claims and Interests, including, without limitation, liens, security interests and any and all other encumbrances.

### C. Acceptance or Rejection of the Plan

#### 1. Presumed Acceptance by Non-Voting Classes

No Classes of Claims or Interests are Impaired under the Plan. Accordingly, each Class is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

#### 2. Voting Classes

No Classes of Claims or Interests are Impaired under the Plan. Accordingly, each Class is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

#### 3. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

As no Classes of Claims or Interests are Impaired under the Plan, section 1129(a)(10) of the Bankruptcy Code is in applicable for the purposes of Confirmation. The Debtors reserve the right to modify the Plan in accordance with Article XI hereof to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules. If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are Impaired, the Court shall, after notice and a hearing, determine such controversy on or before Confirmation.

### D. Means for Implementation of the Plan

#### 1. No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan or reorganization of each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan; *provided* that the Reorganized Debtors may consolidate Allowed Claims on a per Class basis for voting purposes.

#### 2. General Settlement of Claims and Interests

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, including (1) any challenge to the amount, validity, perfection, enforceability, priority or extent

31

of the Mezzanine Loan Claims or Mortgage Loan Claims, and (2) any claim to avoid, subordinate, or disallow any Mezzanine Loan Claims or Mortgage Loan Claims, whether under any provision of chapter 5 of the Bankruptcy Code, on any equitable theory (including equitable subordination, equitable disallowance, or unjust enrichment) or otherwise. This Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable and in the best interests of the Debtors and their Estates. Subject to Article VII hereof, all distributions made to Holders of Allowed Claims and Allowed Interests (as applicable) in any Class are intended to be and shall be final.

### 3.  Restructuring Transactions

On or before the Effective Date, the applicable Debtors or the Reorganized Debtors and NewCo, as applicable, shall enter into and shall take any actions as may be necessary or appropriate to effect either the Alternative Equity Restructuring or the Exit Facility Restructuring, subject to the consent of the Exit Facility Lenders or Shoreview JV LP, as applicable.

The actions to implement either the Alternative Equity Restructuring or the Exit Facility Restructuring may include, among other things: (1) the execution and delivery of appropriate agreements or other documents that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, contribution, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; and (4) all other actions that the applicable Entities determine to be necessary, including making filings or recordings that may be required by applicable law in connection with the Plan. The Confirmation Order shall, and shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize and approve, among other things, the Restructuring Transactions and all actions as may be necessary or appropriate to effect any transaction described in, contemplated by, or necessary to effectuate the Plan.

### 4.  Reorganized Debtors

On the Effective Date, Reorganized Shoreview Holding LLC shall adopt its New Organizational Documents, which shall be consistent with the Plan. Reorganized Debtors and NewCo, as applicable, shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated under the Plan as necessary to consummate the Plan. Cash payments to be made pursuant to the Plan will be made by the Debtors or Reorganized Debtors, as applicable. The Debtors and Reorganized Debtors, as applicable, will be entitled to transfer funds between and among themselves as they determine to be necessary or

appropriate to enable the Debtors or Reorganized Debtors, as applicable, to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

From and after the Effective Date, the Reorganized Debtors and NewCo, as applicable, subject to any applicable limitations set forth in the Definitive Documentation, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors or members of the Reorganized Debtors and NewCo, as applicable, deems appropriate.

### 5.     Sources for Plan Distributions

The Debtors, Reorganized Debtors and NewCo, as applicable, shall fund distributions under the Plan with: (1) Cash on hand, including Cash from operations and Cash in the Cash Management Account and in insurance, tax, and capital expenditure reserves held by Prime pursuant to the Mortgage Loan Documents; and (2) proceeds from the Exit Facilities.

### (a)     Exit Facilities

Unless the Debtors determine, in consultation with the Mortgage Lender and the Mezzanine Lender, that the pursuit of the Alternative Equity Restructuring is in the best interests of the Debtors' Estates and their stakeholders, on the Effective Date, Reorganized Shoreview Holding LLC shall enter into the Exit Facilities the terms of which will be set forth in the Exit Facilities Documents.

In accordance with the terms and conditions set forth in the Exit Facilities Documents, and to the extent applicable, Confirmation of the Plan shall be deemed (a) an approval of the Exit Mortgage Loan and Exit Mezzanine Loan (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid (at any time) by the Debtors, New Mezzanine Borrower or Reorganized Shoreview Holding LLC, as applicable, in connection therewith and subject to all conditions set forth therein), to the extent not approved by the Bankruptcy Court previously, and (b) an authorization for the Debtors, New Mezzanine Borrower or Reorganized Shoreview Holding LLC, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Exit Facilities, including the Exit Mortgage Loan and Exit Mezzanine Loan and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as the Debtors, New Mezzanine Borrower or Reorganized Shoreview Holding LLC, as applicable, may deem to be necessary to consummate the Exit Facilities.

On the Effective Date, the Exit Facilities Documents shall constitute legal, valid, binding, and authorized obligations of Reorganized Shoreview Holding LLC or New Mezzanine Borrower, as applicable, enforceable in accordance with their respective terms. The financial accommodations to be extended pursuant to the Exit Facilities Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including

33

equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facilities Documents (1) shall be deemed to be granted, (2) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facilities Documents, (3) shall be deemed automatically perfected on the Effective Date (without any further action being required by the Debtors, New Mezzanine Borrower, Reorganized Shoreview Holding LLC, or any of the applicable Exit Facility Lenders), having the priority set forth in the Exit Facilities Documents and subject only to such Liens and security interests as may be permitted under the Exit Facilities Documents, and (4) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. Reorganized Shoreview Holding LLC, New Mezzanine Borrower and any other the Entity  granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.  For the avoidance of doubt, the Liens of the Mortgage Lender and Mezzanine Lender shall not be released and shall remain in full force and effect and senior to the Liens of the Exit Facility Lenders until the Allowed Mortgage Loan Claim and the Allowed Mezzanine Loan Claim are indefeasibly paid in full.

**(b)** **Alternative Equity Restructuring**

Upon the Debtors' election to pursue the Alternative Equity Restructuring and Filing of the Alternative Equity Restructuring Notice, on the Effective Date, Reorganized Shoreview Holding LLC shall issue (or caused to be issued) New Equity Interests in connection with the Alternative Equity Investment, pursuant to the Alternative Equity Restructuring.

In accordance with the terms and conditions set forth in the Definitive Documentation with respect to the Alternative Equity Investment, and to the extent applicable, Confirmation of the Plan shall be deemed (a) an approval of the Alternative Equity Investment (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid (at any time) by the Debtors or Reorganized Shoreview Holding LLC, as applicable, in connection therewith and subject to all conditions set forth therein), to the extent not approved by the Bankruptcy Court previously, and (b) an authorization for the Debtors or Reorganized Shoreview Holding LLC, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver those documents necessary or appropriate to obtain the Alternative Equity Investment and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person, subject to such modifications as

34

the Debtors or Reorganized Shoreview Holding LLC, as applicable, may deem to be necessary to consummate the Alternative Equity Restructuring.

### 6.        New Equity Interests

The issuance of the New Equity Interests by Reorganized Shoreview Holding LLC, shall be authorized without any further action by the Holders of Claims or Interests. The Reorganized Debtors and NewCo, as applicable, shall be authorized to issue a certain number of New Equity Interests issued under the Plan and pursuant to their New Organizational Documents. On the Effective Date, the New Equity Interests in Reorganized Shoreview Holding LLC shall be issued to Shoreview JV LP on account of: (i), in the case of an Exit Facility Restructuring, the Equity Investment in accordance with the Plan, or (ii) in case of an Alternative Equity Restructuring, the Alternative Equity Investment in accordance with the Plan,  which New Equity Interests shall be duly authorized, validly issued, fully paid and non-assessable when issued. On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan.

All of the New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance referred to herein shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

### 7.        Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other New Organizational Documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other New Organizational Documents) of one or more of the Reorganized Debtors or NewCo, as applicable, may be amended or modified without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors and/or NewCo, as applicable, may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 8. Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in, or entered into in connection with or pursuant to, the Plan or Plan Supplement, pursuant to sections 1123(a)(5), 1123(b)(3), 1141(b) and (c) and other applicable provisions of the Bankruptcy Code, on or after the Effective Date, all property and assets of each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each applicable Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances subject to (a) Liens that survive the occurrence of the Effective Date (including, without limitation, Liens that secure the Exit Facilities and all other obligations of the applicable Reorganized Debtors and/or New Co, as applicable, under the Exit Facilities Documents) and (b) Liens of the Mortgage Lender and the Mezzanine Lender until the Allowed Mortgage Loan Claim and the Allowed Mezzanine Loan Claim are indefeasibly paid in full. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor and NewCo, as applicable, may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than restrictions expressly imposed by the Plan or the Confirmation Order.

### 9. Cancellation of Existing Securities and Agreements

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, credit agreements, indentures, and other similar documents evidencing Claims or Interests, shall be cancelled and the obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect. Holders of or parties to such canceled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan. Notwithstanding the occurrence of the Confirmation Date, Effective Date, or anything to the contrary herein, but subject to any applicable provisions of Article VII hereof, the Mezzanine Loan Documents and Mortgage Loan Documents, as applicable, shall continue in effect until the Allowed Mortgage Loan Claim and the Allowed Mezzanine Loan Claim are indefeasibly paid in full and solely to the extent necessary to: (1) permit Holders of Claims under the Mezzanine Loan and Mortgage Loan to receive their respective Plan Distributions, as applicable; (2) permit the Reorganized Debtors and/or NewCo, as applicable, lenders under the Mezzanine Loan, and lenders under the Mortgage Loan to make or assist in making, as applicable, Plan Distributions on account of the Mezzanine Loan and Mortgage Loan, as applicable, and deduct therefrom such reasonable compensation, fees, and expenses as may be due. Except as provided in the Plan (including Article VII hereof), on the Effective Date, the Mezzanine Lenders and Mortgage Lenders, and their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the Mezzanine Loan and Mortgage Loan, as applicable. The commitments and obligations (if any) of the Mezzanine Lender and Mortgage Lender to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the Mezzanine Loan and Mortgage Loan, as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

317390990v1

### 10.     Corporate Action

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including: (1) selection of the governing authority of the Reorganized Shoreview Holding LLC; (2) the issuance and distribution of the New Equity Interests; (3) implementation of the Restructuring Transactions, as applicable; (4) entry into the Exit Facilities Documents, as applicable; (5) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date); (6) adoption of the New Organizational Documents; (7) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (8) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate structure of the Debtors, the Reorganized Debtors or NewCo, and any corporate, partnership, limited liability company, or other governance action required by the Debtors, the Reorganized Debtors or NewCo, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the holders of Securities, members, directors, managers, partners or officers of the Debtors, the Reorganized Debtors or NewCo, as applicable, unless otherwise required by applicable law. On or prior to the Effective Date, as applicable, the appropriate officers, managers or partners of the Debtors, the Reorganized Debtors or NewCo, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated under the Plan (or necessary or desirable to effect the Restructuring Transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors, including the New Equity Interests, the New Organizational Documents, the Exit Facilities Documents, as applicable, and any and all other agreements, documents, Securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Section V.J shall be effective notwithstanding any requirements under non-bankruptcy law, in each case in accordance with applicable law.

### 11.     New Organizational Documents

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted by the applicable Reorganized Debtors or NewCo. To the extent required under the Plan or applicable non-bankruptcy law, each of the Reorganized Debtors or NewCo, as applicable, will file its New Organizational Documents, as applicable, with the applicable Secretaries of State and/or other applicable authorities in its respective state or country of organization if and to the extent required in accordance with the applicable laws of the respective state or country of organization. The New Organizational Documents will prohibit the issuance of non-voting equity Securities, to the extent required under section 1123(a)(6) of the Bankruptcy Code. For the avoidance of doubt, the New Organizational Documents shall be consistent with the Plan and in form and substance reasonably acceptable to the Debtors and, in the case of an Exit Facility Restructuring, the Exit Facility Lenders. After the Effective Date, the Reorganized Debtors and NewCo, as applicable, may amend and restate their respective New Organizational Documents, and the Reorganized Debtors and NewCo, as applicable, may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of

317390990v1

the respective states, provinces, or countries of incorporation and the New Organizational Documents, in each case in accordance with applicable law.

### 12. Indemnification Provisions in Organizational Documents

As of the Effective Date, the New Organizational Documents of each Reorganized Debtor shall, to the fullest extent permitted by applicable law, provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, current and former managers, directors, officers, employees, or agents at least to the same extent as the certificate of incorporation, bylaws, or similar organizational document of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed, or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted.

### 13. Managers, General Partners, Directors and Officers of the Reorganized Debtors

The governing authority of Reorganized Shoreview Holding LLC shall be appointed in compliance with section 1129(a)(5) of the Bankruptcy Code. To the extent known, the identity of the members of the governing authority of Reorganized Shoreview Holding LLC will be disclosed in the Plan Supplement or prior to the Confirmation Hearing, consistent with section 1129(a)(5) of the Bankruptcy Code.

Each manager, general partner, director and/or officer of any Reorganized Debtor and NewCo, as applicable, shall serve from and after the Effective Date pursuant to the terms of the applicable New Organizational Documents and other constituent documents. In subsequent terms, the managers, general partners, directors and officers of the Reorganized Debtors shall be selected in accordance with the New Organizational Documents.

### 14. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, and their respective general partners, officers, directors, members, or managers (as applicable), are authorized to and may issue, execute, deliver, File, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 15. Section 1146 Exemption

To the fullest extent permitted by Section 1146(a) of the Bankruptcy Code, any transfers (whether from a Debtor to a Reorganized Debtor or to any other Person) of property under or in connection with the Plan, including pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors or the Reorganized Debtors; (2) the Restructuring Transactions; (3) the creation, modification, consolidation,

38

termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; (5) the grant of collateral as security for the Reorganized Debtors' obligations under and in connection with the Exit Facilities; or (6) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, personal property transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of Section 1146(a) of the Bankruptcy Code, shall forego the collection of any such tax or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 16.    Preservation of Causes of Action

In accordance with Section 1123(b) of the Bankruptcy Code, but subject to **Article IX** of the Plan, each Reorganized Debtor, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors, whether arising before or after the Petition Date, including any actions specifically enumerated in the Retained Causes of Action Schedule, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date, other than (i) the Causes of Action released by the Debtors pursuant to the releases and exculpations contained in the Plan, including in **Article IX** of the Plan, and (ii) any preference actions under Section 547(b) of the Bankruptcy Code, which shall be deemed released and waived by the Debtors and the Reorganized Debtors as of the Effective Date.

The Reorganized Debtors may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. **No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or this Disclosure Statement to any Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan, including Article VIII of the Plan. Unless otherwise agreed upon in writing by the parties to the applicable Cause of Action, all objections to the Retained Causes of Action Schedule must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection that is not timely Filed shall be disallowed and forever barred, estopped, and enjoined from assertion against any Reorganized Debtor, without the need for any**

**objection or responsive pleading by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** The Reorganized Debtors may settle any such objection without any further notice to or action, order, or approval of the Bankruptcy Court. If there is any dispute regarding the inclusion of any Cause of Action on the Retained Causes of Action Schedule that remains unresolved by the Debtors or Reorganized Debtors, as applicable, and the objection party for thirty (30) days, such objection shall be resolved by the Bankruptcy Court. Unless any Causes of Action of the Debtors against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan (including in **Article IX** of the Plan) or a Final Order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain such Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, except as otherwise expressly provided in the Plan, including **Article IX** of the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, File, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, no Causes of Action are preserved against the Mortgage Lender or the Mezzanine Lender under the Plan and all such claims are released and waived as herein provided.

### E.      Treatment of Executory Contracts and Unexpired Leases

#### 1.      Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in **Section VI.H.1** of the Plan and elsewhere in the Plan, all Executory Contracts or Unexpired Leases not otherwise assumed or rejected will be deemed assumed by the applicable Reorganized Debtor in accordance with the provisions and requirements of Sections 365 and 1123 of the Bankruptcy Code, other than those that: (1) are identified on the Rejected Executory Contracts and Unexpired Leases Schedule; (2) previously expired or terminated pursuant to their own terms; (3) have been previously assumed or rejected by the Debtors pursuant to a Final Order; (4) are the subject of a motion to reject that is pending on the Effective Date; or (5) have an ordered or requested effective date of rejection that is after the Effective Date.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions, assumptions and assignments, or rejections of the Executory Contracts or Unexpired Leases as set forth in the Plan or the Rejected Executory Contracts and

40

Unexpired Leases Schedule, pursuant to Sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Final Order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any Final Order authorizing and providing for its assumption. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contracts and Unexpired Leases Schedule at any time up to thirty (30) days after the Effective Date, so long as such allocation, amendment, modification, or supplement is acceptable to the Exit Facility Lenders.

## 2. Indemnification Obligations

On the Effective Date, all Indemnification Provisions shall be deemed and treated as Executory Contracts that are and shall be assumed by the Debtors (and assigned to the applicable Reorganized Debtors, if necessary) on terms no less favorable to the applicable counterparty pursuant to Section 365(a) and Section 1123 of the Bankruptcy Code as to which no proof of Claim, request for administrative expense, or cure claim need be Filed, and all Claims arising from the Indemnification Provisions shall survive the Effective Date and be Unimpaired. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the Indemnification Provisions. Confirmation and Consummation of the Plan shall not impair or otherwise modify any available defenses of the Reorganized Debtors or other applicable parties under the Indemnification Provisions. For the avoidance of doubt, the Indemnification Provisions shall continue to apply with respect to actions, or failures to act, that occurred on or prior to the Effective Date, subject to the terms and conditions of the Indemnification Provisions.

## 3. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Rejection Damages Claims, pursuant to the Plan or the Confirmation

41

Order, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Effective Date. **Any Rejection Damages Claims not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, the Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Rejection Damage Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Rejection Damages Claims shall be classified as General Unsecured Claims and shall be treated in accordance with **Section III.B.5** of the Plan.

### 4. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or the Reorganized Debtors, as applicable, shall pay Cures, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure that differ from the amounts paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan, must be Filed with the Bankruptcy Court on or before thirty (30) days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtors' or Reorganized Debtors', as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

If there is any dispute regarding any Cure, the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of further performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.

42

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable Cure pursuant to **Section V.D** of the Plan shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, and for which any Cure has been fully paid pursuant to this Section V.D, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court**.

### 5. Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Reorganized Debtors, as applicable, under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations with respect to goods previously purchased by the Debtors pursuant to rejected Executory Contracts or Unexpired Leases.

### 6. Insurance Policies

Notwithstanding anything to the contrary in the Definitive Documentation, the Plan Supplement, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction or release or requires a party to opt out of any releases): on and after the Effective Date (i) each of the Debtors' Insurance Contracts, if any, shall be treated as Executory Contracts under the Plan and the Debtors and Reorganized Debtors jointly and severally shall be deemed to have assumed the Insurance Contracts pursuant to sections 105 and 365 of the Bankruptcy Code; (ii) nothing shall alter, amend or otherwise modify the terms and conditions of the Insurance Contracts, if any, except that, on and after the Effective Date, the Reorganized Debtors shall become and remain jointly and severally liable in full for all of their and the Debtors' obligations under the Insurance Contracts, regardless of whether such obligations arise before or after the Effective Date, without the requirement or need for any Insurer to file a Proof of Claim or an Administrative Expense Claim, or to object to any Cure; and (iii) the automatic stay of Bankruptcy Code section 362(a) and the injunction set forth in Section IX.F hereof, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (a) claimants with valid workers' compensation claims or with valid direct action claims against an Insurer under applicable non-bankruptcy law to proceed with their claims; (b) Insurers to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (1) claims where a claimant asserts a direct

43

claim against any Insurer under applicable non-bankruptcy law, or an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Section IX.F hereof to proceed with its claim, and (2) all costs in relation to each of the foregoing; and (c) the Insurers to cancel any Insurance Contracts, and take other actions relating thereto, to the extent permissible under applicable non-bankruptcy law, and in accordance with the terms of the Insurance Contracts.

### 7. Reservation of Rights

Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors or any other party that any contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 8. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Section 365(d)(4) of the Bankruptcy Code.

### 9. Contracts and Leases Entered Into after the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or the Reorganized Debtors in the ordinary course of their business. Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

### F. Provisions Governing Distributions

### 1. Distributions on Account of Claims Allowed as of the Effective Date

Except as otherwise provided the Plan, in a Final Order, or as otherwise agreed to by the Debtors or the Reorganized Debtors, as the case may be, and the Holder of the applicable Allowed Claim on the first Distribution Date, the Reorganized Debtors shall make initial distributions under the Plan on account of Claims Allowed as of the Effective Date, subject to the Reorganized Debtors' right to object to Claims; *provided* that (1) Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice; (2) Allowed Professional Claims shall be paid in accordance with **Section II.C** of the Plan; (3) Allowed Priority Tax Claims shall be paid in accordance with **Section II.E** of the Plan, and (4) Allowed General Unsecured Claims against Debtors shall be paid in accordance

44

with **Section III.B.5** of the Plan. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim shall be indefeasibly paid in full in Cash in accordance with the terms of any agreement between the Debtors and the Holder of such Claim or as may be due and payable under applicable non-bankruptcy law or in the ordinary course of business.

### 2. Disbursing Agent

All distributions under the Plan shall be made by the Disbursing Agent. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

### 3. Rights and Powers of Disbursing Agent

#### (a) Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

#### (b) Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, to the extent the Disbursing Agent is an Entity other than the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by such Disbursing Agent on or after the Effective Date (including taxes), and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses), made by such Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

### 4. Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### (a) Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date. If a Claim, other than one based on a publicly traded Security, is transferred twenty (20) or fewer days before the Distribution Record Date, the Disbursing Agent shall make distributions to the transferee only to the extent practical and, in any event, only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

**(b)      Delivery of Distributions in General**

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (as applicable) as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors.

**(c)      Minimum Distributions**

No fractional shares of New Equity Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Equity Interests that is not a whole number, the actual distribution of shares of New Equity Interests shall be rounded as follows: (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Equity Interests to be distributed to Holders of Allowed Claims hereunder shall be adjusted as necessary to account for the foregoing rounding.

**(d)      Undeliverable Distributions and Unclaimed Property**

In the event that any distribution to any Holder of Allowed Claims is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, *however*, that such distributions shall be deemed unclaimed property under Section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims to such property or Interest in property shall be discharged and forever barred.

**(e)      Surrender of Canceled Instruments or Securities**

On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a certificate or instrument evidencing a Claim or an Interest shall be deemed to have surrendered such certificate or instrument to the Disbursing Agent. Such surrendered certificate or instrument shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the Holder of a Claim or Interest or a trustee or agent under such documents, which shall continue in effect for purposes of allowing Holders to receive distributions under the Plan and maintaining priority of payment, and to preserve any applicable charging liens and reimbursement and/or indemnification rights, in each case as set forth in the applicable certificates or instruments. Notwithstanding anything to the contrary in

317390990v1

the Plan, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

### 5. Manner of Payment

All distributions of the New Equity Interests or Cash to the Holders of the applicable Allowed Claims under the Plan shall be made by the Disbursing Agent on behalf of the Debtors or Reorganized Debtors, as applicable.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements. The Disbursing Agent shall, however, make Cash payments to the Mortgage Lender and the Mezzanine Lender on account of the Mortgage Loan Claim and the Mezzanine Loan Claim, respectively, solely by wire transfer.

### 6. Exemption from Registration Requirements

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Equity Interests, as contemplated by Section III.B hereof, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, such New Equity Interests will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; and (iii) any restrictions in the Reorganized Debtors' New Organizational Documents.

### 7. Compliance with Tax Requirements

In connection with the Plan, to the extent applicable, the Debtors, Reorganized Debtors, Disbursing Agent, and any applicable withholding agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Debtors and Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

8.    **Allocations**

Plan Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

9.    **No Postpetition Interest on Claims**

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period form the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes and Allowed Claim.  For the avoidance of doubt, postpetition interest shall accrue and be indefeasibly paid in full in Cash on account of the Mortgage Loan Claim.

10.    **Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

11.    **Setoffs and Recoupment**

Except as expressly provided in the Plan, each Reorganized Debtor may, pursuant to Section 553 of the Bankruptcy Code, set off and/or recoup against any Plan Distributions to be made on account of any Allowed Claim, any and all claims, rights, and Causes of Action that such Reorganized Debtor may hold against the Holder of such Allowed Claim to the extent such setoff or recoupment is either (1) agreed in amount among the relevant Reorganized Debtor(s) and the Holder of the Allowed Claim or (2) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, *however*, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any and all claims, rights, and Causes of Action that such Reorganized Debtor or its successor may possess against the applicable Holder. In no event shall any Holder of a Claim be entitled to recoup such Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors in accordance with **Section XII.G** of the Plan on or before the Effective Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

48

12. **Claims Paid or Payable by Third Parties**

(a) **Claims Paid by Third Parties**

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives indefeasible payment in full on account of such Claim from a party that is not a Debtor or a Reorganized Debtor. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

(b) **Claims Payable by Third Parties**

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Contracts until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Contract. To the extent that one or more of the Debtors' Insurers agrees to indefeasibly pay in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then immediately upon such Insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c) **Applicability of Insurance Policies**

Except as otherwise provided in the Plan, payments to Holders of Claims covered by Insurance Contracts shall be in accordance with the provisions of the applicable Insurance Contract and the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including Insurers under any Insurance Contract, nor shall anything contained therein constitute or be deemed a waiver by such Insurers of any defenses, including coverage defenses, held by such Insurers.

G. **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

1. **Disputed Claims Process**

Notwithstanding section 502(a) of the Bankruptcy Code, and in light of the Unimpaired status of all Allowed General Unsecured Claims under the Plan, except as required by the Plan,

Holders of Claims need not File Proofs of Claim, and the Reorganized Debtors and the Holders of Claims shall determine, adjudicate, and resolve any disputes over the validity and amounts of such Claims in the ordinary course of business as if the Chapter 11 Cases had not been commenced except that (unless expressly waived pursuant to the Plan) the Allowed amount of such Claims shall be subject to the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 and 503 of the Bankruptcy Code, to the extent applicable. All Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than Rejection Damages Claims and as provided below. Notwithstanding anything in the Plan to the contrary, disputes regarding the amount of any Cure pursuant to section 365 of the Bankruptcy Code and Claims that the Debtors seek to have determined by the Bankruptcy Court, shall in all cases be determined by the Bankruptcy Court.

For the avoidance of doubt, there is no requirement to File a Proof of Claim or Proof of Interest (or move the Bankruptcy Court for allowance) to be an Allowed Claim or Allowed Interest, as applicable, under the Plan. Notwithstanding the foregoing, Entities must File Proofs of Claim for Rejection Damages Claims as set forth in **Section VI.C** of the Plan and Cure objections as set forth in **Section VI.D** of the Plan to the extent such Entity disputes the amount of the Cure paid or proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty. **Except as otherwise provided herein, all Proofs of Claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.**

### 2.     Allowance of Claims

Except as otherwise set forth in the Plan, after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately before the Effective Date, including the Causes of Action retained pursuant to **Section IV.S** of the Plan. Except as specifically provided in the Plan or an order entered by the Bankruptcy Court in the Chapter 11 Cases, no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed in accordance with the Plan.

### 3.     Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors shall have the sole authority: (1) to File, withdraw, or litigate to judgment, objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

Any objections to Claims and Interests other than General Unsecured Claims shall be served and filed on or before the 30th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Claims and Interests other than General Unsecured

50

Claims not objected to by the end of such 30-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Any objections to Rejection Damages Claims shall be served and Filed on or before the 30th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. All Rejection Damages Claims not objected to by the end of such 30-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

Notwithstanding the foregoing, the Debtors and Reorganized Debtors shall be entitled to dispute and/or otherwise object to any General Unsecured Claim in accordance with applicable nonbankruptcy law. If the Debtors, or Reorganized Debtors dispute any General Unsecured Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the manner as if the Chapter 11 Cases had not been commenced. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

### 4. Adjustment to Claims without Objection

Any duplicate Claim or any Claim that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 5. Disallowance of Claims or Interests

All Claims of any Entity from which property is sought by the Debtors under Sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under Sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be Disallowed pursuant to Section 502(d) of the Bankruptcy Code if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

### 6. No Distributions Pending Allowance

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Disputed Claim, as applicable, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim; *provided* that if only the Allowed amount of an otherwise valid Claim is Disputed, such Claim shall be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

51

### 7. Distributions after Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

### H. Settlement, Release, Injunction, and Related Provisions

### 1. Discharge of Claims and Termination of Interests

Pursuant to Section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan (including with respect to Reinstated Claims), the Confirmation Order or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in Sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to Section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

### 2. Release of Liens

**Except as otherwise provided in the Plan (including <u>Section IV.E</u> of the Plan), the Confirmation Order, or in any contract, instrument, or other agreement or document created pursuant to the Plan (including, for the avoidance of doubt, the Exit Facilities Documents), promptly following the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Confirmation Date or Effective Date, as applicable, except for (i) with respect to any Lien securing any Allowed Mezzanine Loan Claims or Mortgage Loan Claims, in each case,**

that are amended and restated under the Exit Facilities, and (ii) Allowed Other Secured Claims that the Debtors elect to Reinstate in accordance with the Plan , all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Reorganized Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery, and Filing or recording of such releases. The presentation or Filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim, including a Holder of any Mezzanine Loan Claims or Mortgage Loan Claims, that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Debtors, the Reorganized Debtors, if any, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

3.  Releases by the Debtors

Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration (including, without limitation, the service of the Released Parties to facilitate the expeditious reorganization of the Debtors, the implementation of the restructuring contemplated by the Plan , and the waiver of certain Claims of certain of the Released Parties against the Debtors) the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, their Estates, and the Reorganized Debtors, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors, their Estates, or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, violations of federal or state securities laws, or otherwise,

53

that the Debtors, their Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Retained Causes of Action Schedule, or (c) actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, their Estates, or the Reorganized Debtors asserting any claim or Cause of Action released pursuant to the Debtor Release.

4.      Releases by the Releasing Parties (the "<u>Third-Party Release</u>")

Effective **as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties from any and all claims, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, violations of federal or state securities laws, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or otherwise based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way in whole or in part to, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) (i) any obligations, which have not been terminated, and are deemed continued, ratified, reaffirmed, amended and restated (including without limitation, any Existing Letters of Credit and any indemnification rights) under the Mezzanine Loan Documents and the Mortgage Loan Documents, as amended and restated by and in accordance with the Exit**

54

Mezzanine Loan Documents and the Exit Mortgage Loan Documents), and (ii) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any Causes of Action included in the Retained Causes of Action Schedule, or (c) actual fraud, willful misconduct, or gross negligence as determined by a Final Order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan , and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

5.      Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any obligation, claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Debtor-Related Matters except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan , including the issuance of securities hereunder. The exculpation hereunder will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation solely for actions taken from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

317390990v1

**Solely with respect to the exculpation provisions, notwithstanding anything to the contrary in the Plan , each of the Section 1125(e) Parties shall not incur liability for any Cause of Action or Claim related to any act or omission in connection with, relating to, or arising out of, in whole or in part, (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan .**

6.      **Injunction**

**Except as otherwise expressly provided in the Plan , or the Confirmation Order, or for obligations issued or required to be paid pursuant the Plan all Entities and Persons are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any Claims or Interests; (b) enforcing, attaching, collecting, or recovering in any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any Claims or Interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment, or other similar legal or equitable right of any kind, in each case in the foregoing classes (a) through (d) on account of or in connection with or with respect to any claim, demand, liability, obligation, debt, right, cause of action, equity interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled or discharged or to be discharged pursuant to the Plan or the Confirmation order against any Person or Entity so released, discharged, or exculpated (or the property or estate of any Person or Entity so released, discharged, or exculpated) unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, discharged, or settled pursuant to the Plan . All injunctions or stays provided for in the Chapter 11 Cases under section 105 or section 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**Upon entry of the Confirmation Order, all Holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect Affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan . Each Holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan , shall be deemed to have consented to the injunction provisions set forth <u>Section VIII.F</u> of the Plan.**

### 7. Protections against Discriminatory Treatment

Consistent with Section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 8. Waiver of Statutory Limitation on Releases

Each of the Releasing Parties in each of the releases contained above expressly acknowledges that although ordinarily a general release may not extend to Claims which the Releasing Party does not know or suspect to exist in its favor, which if known by it may have materially affected its settlement with the party released, they have carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims. Without limiting the generality of the foregoing, each Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of providing the release, which if known by it may have materially affected its settlement with the released party. The releases contained in the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

### 9. Reimbursement or Contribution

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to Section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding Section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### 10. Integral Part of Plan

Each of the provisions set forth in the Plan with respect to the settlement, release, discharge, exculpation, injunction, indemnification and insurance of, for or with respect to Claims and/or Causes of Action are an integral part of the Plan and essential to its implementation. Accordingly, each Entity that is a beneficiary of such provision shall have the right to independently seek to enforce such provision and such provision may not be amended, modified, or waived after the Effective Date without the prior written consent of such beneficiary.

317390990v1

## I.       Conditions Precedent to Confirmation and Consummation of the Plan

### 1.       Condition Precedent to Confirmation

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of **Article X.C** of the Plan:

> **(a)**       The Plan and the Definitive Documentation shall be in form and substance consistent in all material respects with the Plan and otherwise acceptable to the Debtors, Prime, and , in the case of an Exit Facility Restructuring, the Exit Facility Lenders;

> **(b)**       The Plan Supplement shall have been Filed not later than two (2) business days prior to the Confirmation Hearing; and

> **(c)**       The Confirmation Order have been entered by the Bankruptcy Court which shall be in form and substance acceptable to Prime and, in the case of an Exit Facility Restructuring, the Exit Facility Lenders.

### 2.       Conditions Precedent to the Effective Date

The following shall be conditions to the Effective Date (the "**Conditions Precedent**"):

> **(a)**       the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance acceptable to the Debtors, Prime and, in the case of an Exit Facility Restructuring, the Exit Facility Lenders, shall be a Final Order, and shall:

>> **(i)**       authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

>> **(ii)**       decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

>> **(iii)**       authorize the Debtors, as applicable/necessary, to: (A) implement the Restructuring Transactions, as applicable; (B) distribute the New Equity Interests pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (C) make all distributions and issuances as required under the Plan, including Cash and the New Equity Interests; and (D) enter into any agreements,

58

transactions, and sales of property as set forth in the Plan and Plan Supplement, including, in the case of an Exit Facility Restructuring, the Exit Facilities Documents;

(iv)    authorize the implementation of the Plan in accordance with its terms;

(v)    provide that, pursuant to Section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;

**(b)**    the Debtors shall have obtained all authorizations, consents, governmental approvals and consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

**(c)**    the Plan, this Disclosure Statement, and the other Definitive Documentation, and all other documents contained in any supplement to the Plan, including any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein, shall have been executed or Filed, as applicable, in form and substance consistent in all material respects with the Plan, shall be in form and substance acceptable to the Debtors and, in the case of an Exit Facility Restructuring, the Exit Facility Lenders, and shall be in full force and effect;

**(d)**    in the case of an Exit Facility Restructuring, the Exit Facilities shall be in full force and effect and be consummated concurrently with the Effective Date (with all conditions precedent (other than any conditions related to the Effective Date) to the effectiveness of the Exit Facilities having been satisfied or waived in accordance with the terms thereof, including, but not limited to, that all documents related to the Exit Facilities shall have been duly executed and delivered by all the relevant parties thereto);

**(e)**    the Debtors shall have implemented the Restructuring Transactions, as applicable, and all transactions contemplated by the Plan, in a manner consistent in all respects the Plan, pursuant to documentation acceptable to

59

the Debtors and, in the case of an Exit Facility Restructuring, the Exit Facility Lenders;

**(f)**     the Plan shall not have been materially amended, altered, or modified from the Plan confirmed by the Confirmation Order, unless such material amendment, alteration, or modification has been made in accordance with **Section X.A** of the Plan and is otherwise reasonably acceptable to the Debtors, Prime, and, in the case of an Exit Facility Restructuring, the Exit Facility Lenders;

**(g)**     the Debtors shall have paid in Cash to the Mortgage Lender and the Mezzanine Lender the amounts required to indefeasibly pay in full the Allowed Mortgage Loan Claim and the Allowed Mezzanine Loan Claim, respectively; and

**(h)**     each of the foregoing Conditions Precedent shall have been satisfied on or before July 23, 2025 (or such later date agreed to in writing by Mortgage Lender and Mezzanine Lender).

**3.       Waiver of Conditions**

The conditions to Confirmation and consummation set forth in **Article VII** of the Plan may be waived by the Debtors only with the prior written consent of Prime and, solely in the case of an Exit Facility Restructuring, Prime and the Exit Facility Lenders (email shall suffice), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan; provided, however, that the Condition Precedent set forth in subparagraph (h) above may be extended with prior written consent of the Debtors, the Mortgage Lender, and the Mezzanine Lender, without consent from the Exit Facility Lenders.

**4.       Effect of Failure of Conditions**

If Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, this Disclosure Statement shall: (1) constitute a waiver or release of any Claims by the Debtors, or Claims against, or Interests in, the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

**5.       Substantial Consummation**

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

### J.        Modification, Revocation, or Withdrawal of Plan

#### 1.        Modification and Amendments

Except as otherwise specifically provided in the Plan, with the consent of Prime and, in the case of an Exit Facility Restructuring, the Exit Facility Lenders, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to those restrictions on modifications set forth in the Plan and the requirements of section 1127 of the Bankruptcy Code, Rule 3019 of the Federal Rules of Bankruptcy Procedure, and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan , the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

#### 2.        Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

#### 3.        Revocation, Withdrawal, and Voidance of Plan

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors (i) revoke or withdraw the Plan, or (ii) if Confirmation or Consummation does not occur, or (iii) if the Mezzanine Lender does not receive indefeasible payment in full in Cash of its Allowed Mezzanine Loan Claim on or before the Payment Deadline and subject to the same terms and conditions set forth in the Agreed Lift Stay Order (absent the Mezzanine Lender's consent in writing to an extension of the Payment Deadline), then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity.

### K.        Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to Sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

(a)     allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

(b)     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

(c)     resolve any matters related to: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to Section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (iii) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to **Article V** of the Plan, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (iv) any dispute regarding whether a contract or lease is or was executory or expired;

(d)     ensure that distributions to Holders of Allowed Claims and Allowed Interests (as applicable) are accomplished pursuant to the provisions of the Plan;

(e)     adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

(f)     adjudicate, decide, or resolve any and all matters related to Section 1141 of the Bankruptcy Code;

(g)     enter and implement such orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or this Disclosure Statement, except to the extent

62

that the Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

**(h)** enter and enforce any order for the sale of property pursuant to Sections 363, 1123, or 1146(a) of the Bankruptcy Code;

**(i)** resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

**(j)** issue injunctions, enter and implement other orders, or take such other actions as may be necessary to restrain interference by any Entity with Consummation or enforcement of the Plan;

**(k)** resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in **Article VIII** of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

**(l)** resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to **Section VII** of the Plan;

**(m)** enter and implement such orders as are necessary if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

**(n)** determine any other matters that may arise in connection with or relate to the Plan, this Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in

63

connection with the Plan, the Plan Supplement, or this Disclosure Statement;

**(o)**      enter an order concluding or closing the Chapter 11 Cases;

**(p)**      adjudicate any and all disputes arising from or relating to distributions under the Plan;

**(q)**      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

**(r)**      determine requests for the payment of Claims and Interests entitled to priority pursuant to Section 507 of the Bankruptcy Code;

**(s)**      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, except to the extent that any Definitive Documentation provide for exclusive jurisdiction and venue in another forum;

**(t)**      hear and determine matters concerning state, local, and federal taxes in accordance with Sections 346, 505, and 1146 of the Bankruptcy Code;

**(u)**      hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under **Article VIII** of the Plan;

**(v)**      enforce all orders previously entered by the Bankruptcy Court; and

**(w)**      hear any other matter not inconsistent with the Bankruptcy Code.

As of the Effective Date, notwithstanding anything in **Article XI** of the Plan to the contrary, the New Organizational Documents and the Exit Facilities, as applicable, and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

317390990v1

L.    **Miscellaneous Provisions**

1.    **Immediate Binding Effect**

Subject to **Section IX.A** of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan (including, for the avoidance of doubt, the documents and instruments contained in the Plan Supplement) shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

2.    **Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

3.    **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order, and the Confirmation Order shall have no force or effect if the Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, this Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

4.    **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, manager, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

5.    **Notices**

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

65

| Debtors | Counsel to the Debtors |
|---|---|
| Shoreview Holdings LLC<br>9050 N. Capital of Texas Hw<br>Bldg. 3, Suite 320<br>Austin, Texas 78759<br>Attention: Legal Dept | Troutman Pepper Locke LLP<br>300 Colorado St., Suite 2100<br>Austin, TX 78701<br>Attention:  Daniel Durell<br>        Stephen J. Humeniuk |
| **United States Trustee** | |
| Office of The United States Trustee<br>903 San Jacinto Blvd<br>Room 230<br>Austin, TX 78701 | |

After the Effective Date, the Reorganized Debtors have the authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

## 6.      Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to Sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 7.      Entire Agreement

Except as otherwise indicated, and without limiting the effectiveness of the Plan (including, for the avoidance of doubt, the documents and instruments in the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## 8.      Exhibits and Annexes

All exhibits, annexes, and documents attached to the Plan or included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits, annexes, and documents are Filed, copies of such exhibits, annexes, and documents shall be available upon written request to the Debtors' counsel at the address above. To the extent any exhibit, annex, or document is inconsistent with the terms of the Plan, unless otherwise ordered

66

by the Bankruptcy Court or otherwise specifically provided for in such exhibit, annex, or document, the non-exhibit, non-annex, or non-document portion of the Plan shall control.

### 9. Non-severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' or Reorganized Debtors' consent, as applicable; *provided* that, in the case of an Exit Facility Restructuring, any such deletion or modification must be acceptable to the Exit Facility Lenders; and (3) non-severable and mutually dependent.

### 10. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, the Released Parties will be deemed to have solicited votes on the Plan in good faith and in compliance with Section 1125(g) of the Bankruptcy Code and any applicable non-bankruptcy law, and pursuant to Section 1125(e) of the Bankruptcy Code, the Released Parties and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

### 11. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; *provided*, *however*, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in Texas shall be governed by the laws of the state of incorporation or formation of the relevant Debtor or the Reorganized Debtors, as applicable.

### 12. Closing of Chapter 11 Cases

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

### 13. Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, this Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

## VIII. LIQUIDATION ANALYSIS, VALUATION, AND FINANCIAL PROJECTIONS

### A. Liquidation Analysis

The Debtors believe that the Plan provides a greater recovery for Holders of Allowed Claims, and no less recovery for Holders of Interests, than would be achieved in a liquidation under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including (a) liquidation values of the Debtors' assets already being significantly lower than the Debtors' secured debt; (b) the likely erosion in value of the Debtors' assets in a chapter 7 case; (c) the additional Administrative Expense Claim and Professional Claims generated by conversion to a chapter 7 case and any related costs; (d) the absence of a robust market in which the Debtors' assets could be marketed and sold pursuant to a liquidation sale; and (e) the additional Claims that would arise by reason of the breach or rejection in a chapter 7 case of obligations under leases and executory contracts that would otherwise be assumed under the Plan.

The Debtors, with the assistance of their professionals, have prepared the Liquidation Analysis, which is attached hereto as **Exhibit B**, to assist Holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result for the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan. The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Further, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

### B. Valuation Analysis

The Debtors, with the assistance of their professionals, have performed an analysis, which is attached hereto as **Exhibit D**, of the estimated implied value of Reorganized Shoreview Holding LLC and its subsidiaries on a going-concern basis as of an assumed Effective Date of July 23, 2025 (the "**Valuation Analysis**"). The Valuation Analysis, including the procedures followed, assumptions made, qualifications, and limitations on review undertaken and described therein,

should be read in conjunction with **Section XII** of this Disclosure Statement, entitled "Risk Factors." The Valuation Analysis is based on data and information as of the date of this Disclosure Statement. Neither the Debtors, nor their professionals makes no representations as to changes to such data and information that may have occurred since the date of the Valuation Analysis.

### C.      Financial Projections

As further discussed in **Section X** of this Disclosure Statement, the Debtors believe the Plan meets the feasibility requirements set forth in Section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by a liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor to the Debtors under the Plan. In connection with the Solicitation and seeking Confirmation of the Plan, and for purposes of determining whether the Plan satisfies the feasibility standards, the Debtors' management has developed the Financial Projections attached hereto as **Exhibit C**.

Creditors and other interested parties should see **Section XII** of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future performance of the Reorganized Debtors.

### Note about Forward-Looking Statements

Various statements contained in this Disclosure Statement, including those that express a belief, expectation or intention, as well as those that are not statements of historical fact, may constitute "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. These forward-looking statements may include projections and estimates concerning the timing and success of specific projects and the Debtors' future revenues, expenses, income, financial liquidity and covenant compliance, and capital spending. The Debtors' forward-looking statements are generally accompanied by words such as "estimate," "project," "predict," "believe," "expect," "anticipate," "potential," "plan," "goal," "will" or other words that convey the uncertainty of future events or outcomes. The Debtors have based these forward-looking statements on the Debtors' current expectations and assumptions about future events. While the Debtors' management considers these expectations and assumptions to be reasonable, they are inherently subject to significant business, economic, competitive, regulatory and other risks, contingencies and uncertainties, most of which are difficult to predict and many of which are beyond the Debtors' control. These and other important factors may cause the Debtors' actual results, performance or achievements to differ materially from any future results, performance or achievements expressed or implied by these forward-looking statements, and other unknown factors could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from any future results expressed or implied by such forward-looking statements. There can be no assurance that the Restructuring described in this Disclosure Statement will be consummated. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- The Chapter 11 Cases, including the Debtors' ability to obtain Confirmation or an alternative restructuring transaction;

69

- The Debtors' ability to obtain the approval of the Bankruptcy Court with respect to motions or other requests made to the Bankruptcy Court, including maintaining strategic control as debtor in possession;

- The effects of these Chapter 11 Cases on the Debtors and on the interests of the various constituents, including holders of the Debtors' common stock and indebtedness;

- The length of time that the Debtors will operate under Chapter 11 protection and the continued availability of capital during the pendency of the proceedings;

- Any future effects as a result of the pendency of or emergence from the Chapter 11 Cases or ability to emerge from Chapter 11;

- The adequacy and availability of capital resources, credit, and liquidity, including, but not limited to, debt refinancing or extensions, exchanges or repurchases of debt, issuances of debt or equity securities, access to additional borrowing capacity and the Debtors' ability to generate sufficient cash flow from operations to fund the Debtors' capital expenditures and meeting working capital needs;

- Fluctuation of the Debtors' operating results and volatility of the Debtors' industry;

- The loss of any of the Debtors' customers, including tenants of the Property, financial distress or management changes of potential customers or failure to obtain lease renewals and additional leases for the Debtors' Property;

- Overcapacity and competition in the Debtors' industry and geographic location of the Property;

- An increase in interest rates and deterioration in the credit markets;

- The loss of key management personnel;

- Labor costs or shortages of skilled workers;

- The loss of or interruption in operations of one or more key vendors;

- The effect of operating hazards and severe weather on the Debtors' Property and limitations on the Debtors' insurance coverage;

- The potential failure by us to establish and maintain effective internal control over financial reporting and cybersecurity risks.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan.

**Creditors and other interested parties should read <u>Section XII</u> of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the ability of the Debtors to reorganize and the future financial performance of the Reorganized Debtors.**

2

## IX.    CORPORATE GOVERNANCE

### A.    New Organizational Documents

On or immediately prior to the Effective Date, the Debtors or the Reorganized Debtors will enact certain new corporate governance as will be set forth in the New Organizational Documents to be filed with the Plan Supplement. The New Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code.

### B.    Directors and Officers of the Reorganized Debtors

The New Board shall have full power and authority to manage and control the business and affairs of the Company and its subsidiaries. The identities of the members of the New Board shall be Filed with the Plan Supplement.

## X.    FEASIBILITY AND BEST INTEREST OF THE CREDITORS

### A.    Feasibility of the Plan

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the chapter 11 plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of, the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan and to continue operating as a going concern. As part of this analysis, the Debtors prepared the Financial Projections, as set forth in **Exhibit C** attached hereto. Based on such Financial Projections, the Debtors believe that they will be able to make all payments required under the Plan and, therefore, Confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization of the Reorganized Debtors.

### B.    Best Interests of Creditors Test

Often called the "best interests" test, Section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation, that a chapter 11 plan of reorganization provides, with respect to each class of claims and interests, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7.

In order to satisfy the "best interests" test, the Debtors have attached hereto as **Exhibit B** the Liquidation Analysis. The Liquidation Analysis demonstrates that the distributions to all Classes of Claims and Interests under the Plan is not less than the amount that Holders in such Classes are likely to receive if the Debtors were liquidated under chapter 7.

## XI.      CONFIRMATION PROCEDURES

### A.      Confirmation Hearing

Section 1129(a) of the Bankruptcy Code requires a bankruptcy court, after notice, to hold a hearing on confirmation of a chapter 11 plan. The Bankruptcy Code further provides that any party in interest may object to the confirmation of a chapter 11 plan.

The Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing for July 22, 2025, at the United States Bankruptcy Court for the Western District of Texas. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Debtors will request that the Bankruptcy Court direct that objections, if any, to confirmation of the Plan be served and filed so that they are received on or before July 21, 2025 at 4:00 p.m. (prevailing Central Time). **THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO CONFIRMATION OF THE PLAN IF ANY SUCH OBJECTIONS HAVE NOT BEEN TIMELY SERVED AND FILED IN COMPLIANCE WITH THE ORDER APPROVING THE DISCLOSURE STATEMENT.**

### B.      Statutory Requirements for Confirmation of the Plan

Among the requirements for the confirmation of a chapter 11 plan of reorganization are that such plan (i) is accepted by all impaired classes of claims and interests, or if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is feasible; and (iii) is in the "best interests" of holders of claims and interests that are impaired under the plan.

In these Chapter 11 Cases, at the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Plan satisfies all of the necessary statutory requirements of chapter 11, (ii) they have complied or will have complied with all of the necessary requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

#### 1.      Acceptance by Impaired Classes

The Bankruptcy Code requires that, as a condition to confirmation, except as described in **Section XI.B.2** of this Disclosure Statement, each class of claims or interests that is impaired under a chapter 11 plan of reorganization, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.[4]

---

[4] As described in Section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan: (a) leaves unaltered the holder for certain damages or losses, as applicable, and does not otherwise the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest or (b) cures any default,

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims or interests as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims or interests in that class, counting only those claims or interests that actually voted to accept or to reject the plan.

Here, no Classes of Claims or Interests are Impaired under the Plan. Accordingly, each Class is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

## 2. Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code Section 1129(b) allows a bankruptcy court to confirm a plan, even if an impaired class has not accepted it, provided that the plan has been accepted by at least one impaired class. The Plan provides that Class 4 is deemed to reject the Plan, and the Debtors cannot guarantee that the Voting Classes will accept the Plan. The Debtors intend to seek confirmation of the Plan pursuant to Bankruptcy Code Section 1129(b). Bankruptcy Code Section 1129(b) states that, notwithstanding an impaired class's failure to accept a plan of reorganization, the plan may still be confirmed, so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that pursuant to Section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement. With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank. With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of allowed Claims in that Class. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

---

reinstates the original terms of such obligation, compensate equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

As stated herein and in the Plan, no Classes of Claims or Interests are Impaired under the Plan. Accordingly, each Class is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any Exhibit thereto and any Plan Supplement, including to amend or modify it to satisfy Bankruptcy Code Section 1129(b), if necessary.

## XII. RISK FACTORS

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.

### A. Bankruptcy-Specific Considerations

### 1. General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their vendors and tenants at the Property. The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2. Objections to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that parties in interest will not object to the classification of Claims and Interests under the Plan, or that the Bankruptcy Court will approve such classification.

### 3. Non-Confirmation or Delay of Confirmation of the Plan

As there are no Classes of Claims or Interests Impaired under the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. The Debtors can give no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

317390990v1

Alternatively, the Debtors may nevertheless seek Confirmation of the Plan notwithstanding the dissent of certain Classes of Claims or Interests.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. A dissenting Holder of a Claim or Interest against the Debtors could challenge the balloting procedures as not being in compliance with the Disclosure Statement Order and the Bankruptcy Code, which could mean that the results of the balloting may be invalid. If the Bankruptcy Court determined that the balloting procedures were appropriate and the results were valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court found that any of the statutory requirements for confirmation had not been met.

For the Debtors to emerge successfully from the Chapter 11 Cases as viable entities, the Debtors, like any other chapter 11 debtor, must obtain approval from their creditors and confirmation of the Plan by the Bankruptcy Court, and then successfully implement the Plan. The foregoing process requires the Debtors to (i) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement, (ii) solicit and obtain creditor acceptances of the Plan, and (iii) fulfill other statutory conditions with respect to the confirmation of the Plan.

Although the Debtors believe that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. The Debtors also understand that parties in interest may object to Confirmation. Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation, or that such modifications would not necessitate the re-solicitation of votes to accept the Plan, as modified. If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their business; (b) the distributions that Holders of Claims and Interests ultimately would receive, if any, with respect to their Claims or Interests is uncertain; and (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims and Interests. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and seek to confirm a plan of reorganization.

### 4.      Non-Consensual Confirmation

In the event that any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. These requirements must be satisfied with respect to Class7, and any Voting Classes that votes to reject the Plan (if any). The Debtors believe that the Plan satisfies these requirements.

66

### 5.  Non-Occurrence of the Effective Date

As more fully set forth in **Article IX** of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

### 6.  Conversion to Chapter 7

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* **Section VIII.A** of this Disclosure Statement, as well as the Liquidation Analysis attached hereto as **Exhibit B**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests.

### 7.  Impact of Chapter 11 Cases on the Debtors

The Plan affects both the Debtors' capital structure and the ownership, structure and operation of their business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including, but not limited to, the Debtors' (i) ability to obtain adequate liquidity and financing sources; and (ii) ability to maintain tenant and vendor confidence in the Debtors' viability as a continuing entity and to attract and retain sufficient business from them. The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon Financial Projections, which are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful execution of the Plan.

Finally, the pursuit of these Chapter 11 Cases has consumed and will continue to consume a substantial portion of the time and attention of management, which may have an adverse effect on the Debtors' business and results of operations. The Debtors may also face increased levels of tenant attrition.

### 8.  Inability to Assume Executory Contracts

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases that are not specifically rejected as set forth in the Plan. The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as

possible. However, with respect to some limited classes of Executory Contracts, including, for example, licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

### 9. Votes and Recoveries Subject to Contingencies

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Voting Classes to accept or reject the Plan or require any sort of revote by the Voting Class.

The estimated Claims and creditor recoveries that will be forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 10. Ability to Discharge or Satisfy Prepetition Claims

The Debtors may be subject to Claims in various legal proceedings and may become subject to other legal proceedings in the future. Although any such Claims will generally be stayed while the Chapter 11 Cases are pending, the Debtors may not be successful in ultimately discharging or satisfying such Claims. The ultimate outcome of each of these matters, including the Debtors' ability to have these matters satisfied and discharged in the bankruptcy proceeding, cannot presently be determined, nor can the liability that may potentially result from a negative outcome be reasonably estimated presently for every case. The liability the Debtors may ultimately incur with respect to any one of these matters in the event of a negative outcome may be in excess of amounts currently accrued with respect to such matters and, as a result, these matters may potentially be material to the Debtors' business, financial condition, and/or results of operations.

### 11. Failure to Obtain Approval of Releases, Injunctions, and Exculpation

**Article VIII** of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases of claims and causes of action that may otherwise be asserted against the Debtors, Reorganized Debtors, or other Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. Any party in interest, including the

68

U.S. Trustee, could object to the Plan on the grounds that the third-party release contained in **Section VIII.D** of the Plan is not given consensually or in a permissible nonconsensual manner. In response to such an objection, the Bankruptcy Court could determine that the third party release is not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the third-party release, in which case the Released Parties may withdraw their support for the Plan. This could result in substantial delay in Confirmation of the Plan or the Plan not being confirmed at all.

### 12. Plan Based on Assumptions

The Plan affects both the Debtors' capital structure and the ownership, structure, and operation of its business and reflects assumptions and analyses based on the Debtors' experience and perception of historical trends, current conditions, and expected future developments, as well as other factors that the Debtors consider appropriate under the circumstances. Whether actual future results and developments will be consistent with the Debtors' expectations and assumptions depends on a number of factors, including but not limited to the Debtors' (i) ability to obtain adequate liquidity and financing sources; (ii) ability to maintain customers' confidence in the Debtors' viability as a continuing entity and to attract and retain sufficient business from them; and (iii) ability to retain Debtors' employees, as well as the overall strength and stability of general economic conditions of the oil and gas industry.

The failure of any of these factors could materially adversely affect the successful reorganization of the Debtors' business.

In addition, the Plan relies upon the Financial Projections, which are necessarily speculative, and it is likely that one or more of the assumptions and estimates that are the basis of these financial forecasts will not be accurate. Consequently, there can be no assurance that the results or developments contemplated by any plan of reorganization implemented will occur or, even if they do occur, that they will have the anticipated effects on the Debtors and their subsidiaries or their business or operations. The failure of any such results or developments to materialize as anticipated could materially adversely affect the successful implementation of the Plan.

### B. Risks Related to the Debtors' Business Operations and Financial Condition

### 1. Substantial Leverage; Ability to Service Debt

According to the terms and conditions of the Plan, upon the Effective Date, the Reorganized Debtors may have outstanding net indebtedness under the Exit Facilities.

The Reorganized Debtors' ability to service their debt obligations will depend, among other things, upon their future operating performance. These factors depend partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient Cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain

69

additional financing or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

Any default under the Exit Facilities Documents could adversely affect their growth, financial condition, results of operations, the value of their equity and ability to make payments on such debt. The Reorganized Debtors may incur significant additional debt in the future. If current debt amounts increase, the related risks that the Reorganized Debtors now face will intensify.

### 2. Restrictive Covenants in Exit Facilities Documents

The Exit Facilities Documents may contain a number of significant covenants that could adversely affect the Reorganized Debtors' ability to operate their business, as well as significantly affect their liquidity, and therefore could adversely affect the Reorganized Debtors' results of operations. These covenants may restrict (subject to certain exceptions) the Reorganized Debtors' ability to incur additional indebtedness; grant liens; consummate mergers, acquisitions consolidations, liquidations and dissolutions; sell assets; pay dividends and make other payments in respect of capital stock; make capital expenditures; make investments, loans and advances; make payments and modifications to subordinated and other material debt instruments; enter into transactions with Affiliates; consummate sale-leaseback transactions; change their fiscal year; and enter into hedging arrangements (except as otherwise expressly permitted). In addition, the Reorganized Debtors may be required to maintain a minimum fixed charge coverage ratio, interest coverage ratio, maximum leverage ratio and/or comply with other financial covenants.

The breach of any covenants or obligations in the Exit Facilities Documents not otherwise waived or amended, could result in a default of such documents and could trigger acceleration of certain obligations thereunder. Any default of the Exit Facilities Documents could adversely affect the Reorganized Debtors' growth, financial condition, results of operations, and ability to make payments on debt.

### 3. Effect of Uncertainty on Contract Counterparties

Uncertainty about the effects of the Plan on counterparties may have an adverse effect on the Debtors. These uncertainties may impair the Debtors' ability, as well as the Property Manager's ability to retain and motivate their personnel and could cause users and others that deal with the Debtors to defer entering into contracts with the Debtors and/or the Property Manager or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors and/or Property Manager.

### 4. Adverse Impact of Prepetition and Postpetition Litigation

In the future, the Reorganized Debtors may become party to litigation. In general, litigation can be expensive and time consuming to bring or defend against. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' business and financial stability, however, could be material.

70

### 5. Inability to Obtain Capital

The Debtors' cash flow from operations and the continued availability of credit are subject to a number of variables, including general economic conditions, conditions in the multi-family real estate market and ability to control costs and obtain contracts in a competitive industry. The Debtors' cash flow from operations and present borrowing capacity may not be sufficient to fund their anticipated capital expenditures and working capital requirements. They may from time to time seek additional financing, either in the form of bank borrowings, sales of debt or equity securities or otherwise. To the extent the Debtors' capital resources and cash flow from operations are at any time insufficient to fund the Debtors' activities or repay their indebtedness as it becomes due, they will need to raise additional funds through public or private financing or additional borrowings. The Debtors may not be able to obtain any such capital resources in the amount or at the time when needed. Any new sources of debt capital would require substantially higher interest requirements, and any new sources of equity capital could be substantially dilutive to existing shareholders. Any limitations on the Debtors' access to capital or increase in the cost of that capital could significantly impair their operational strategies. The Debtors' ability to maintain their targeted credit profile could affect their cost of capital as well as their ability to execute their growth strategy. In addition, a variety of factors beyond their control could impact the availability or cost of capital, including domestic or international economic conditions, increases in key benchmark interest rates and/or credit spreads, the adoption of new or amended banking or capital market laws or regulations, the re-pricing of market risks and volatility in capital and financial markets. If the Debtors are at any time not able to obtain the necessary capital resources, their financial condition and results of operations could be materially adversely affected.

### 6. Financial Projections

The Financial Projections set forth in **Exhibit C** to this Disclosure Statement represent the Debtors' management's best estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations as well as the U.S. and world economy in general and the industry segments in which the Debtors operate in particular. The Debtors' actual financial results may differ significantly from the Financial Projections. If the Debtors do not achieve their projected financial results, the value of the New Common Stock may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date. Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 7. Variance between Historical Performance and Future Performance of Reorganized Debtors

As a result of the Plan and the transactions contemplated thereby, the financial conditions and results of the operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### C. Risks Related to the New Common Stock

#### 1. Lack of Public Market or Valuation Analysis for Plan Securities

It is anticipated that there will be no active trading market for the New Common Stock. The New Common Stock will be subject to restrictions on transfer. Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such securities. Furthermore, the lack of liquidity may adversely affect the price at which New Common Stock may be sold, if at all.

The liquidity of any market for the New Common Stock will depend on a number of factors, including, without limitation:

- the number of holders of the New Common Stock;
- the Reorganized Debtors' operating performance and financial condition;
- the market for similar securities; and
- the interest of securities dealers in making a market in the New Common Stock.

The Valuation Analysis, attached hereto as **Exhibit D**, are based on the Financial Projections and is not intended to represent the trading values of New Common Stock in public or private markets.

#### 2. Restrictions on Transfer

The offer, issuance, and distribution of the New Common Stock pursuant to or in connection with the Plan will be exempt from registration under the Securities Act pursuant to any available exemption, including, but not limited to, Section 3(a)(9) of the Securities Act and Section 1145 of the Bankruptcy Code. Accordingly, recipients will be able to resell the New Common Stock without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such securities, within the meaning of Section 1145(b) of the Bankruptcy Code. The Holders of Notes Claims who receive securities issued under or in connection with the Plan who are deemed to be "underwriters" as defined in Section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell their securities. In addition, securities issued under the Plan to affiliates of the Reorganized Debtors will be subject to restrictions on resale. These persons will be permitted to transfer or sell such securities only pursuant to the provisions of Rule 144 or Rule 144A under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act. Parties that believe that they may be statutory underwriters as defined in Section 1145(b) of the Bankruptcy Code are advised to consult with their own counsel as to the availability and requirements of the non-exclusive exemptions provided by Rule 144 and Rule 144A.

As the New Common Stock may be held by fewer than 300 holders, the Debtors anticipate that they may be able to suspend their reporting obligations under the Exchange Act. As a result, the Reorganized Debtors may not be obligated to file periodic or other reports with the SEC following any such suspension. The New Organizational Documents or Stockholders' Agreement of Reorganized Shoreview Holdings LLC may include restrictions on transfer of the New Common

Stock intended to ensure that the New Common Stock does not become held by such number of persons as would require any Reorganized Debtors to continue or resume filing periodic or other reports pursuant to the Exchange Act. These restrictions may adversely impact the value of the shares of New Common Stock and make it more difficult for such shareholders to dispose of their shares, or to realize value on the shares and warrants, at a time when they may wish to do so.

See **Section XIII** of this Disclosure Statement, entitled "Certain Securities Law Matters" for additional information regarding restrictions on resale of the New Common Stock.

### 3. Potential for Dilution

The Debtors cannot predict the effect of future sales of shares or the availability of shares for future sales, on the market price of or the liquidity of the market for the shares. Sales of substantial amounts of shares, or the perception that such sales could occur, could adversely affect the prevailing market price of the shares. Such sales, or the possibility of such sales, could also make it difficult for the Debtors to sell equity securities in the future at a time and at a price that the Debtors deem appropriate.

In the future, Reorganized Shoreview Holdings LLC may issue equity securities in connection with future investments, acquisitions or capital raising transactions. Such grants or issuances could constitute a substantial portion of the then-outstanding common stock, which may result in substantial dilution in ownership to holders of New Common Stock.

### 4. Adverse Effects on Value of New Common Stock

The value of New Common Stock may be adversely affected by a number of factors, including many of the risks described in this Disclosure Statement. If, for example, the Reorganized Shoreview Holdings LLC fails to comply with the covenants in the Exit Facilities Documents resulting in an event of default thereunder, certain of the Reorganized Shoreview Holdings LLC's outstanding indebtedness could be accelerated, which could have a material adverse effect on the value of the New Common Stock.

## XIII. CERTAIN SECURITIES LAW MATTERS

### A. Plan Securities

The Debtors believe that the securities offered and distributed under the Plan constitute "securities," as defined in Section 2(a)(1) of the Securities Act, Section 101 of the Bankruptcy Code and all applicable state Blue Sky Laws. The Debtors further believe that the offer and sale of such securities are, and subsequent transfers of such securities by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state Blue Sky Laws.

B.        **Issuance and Resale of Plan Securities under the Plan**

1.        **Exemptions from Registration Requirements of the Securities Act and State Blue Sky Laws**

The Debtors believe that, subject to certain exceptions described below, various provisions of the Securities Act, the Bankruptcy Code, and Blue Sky Laws exempt from federal and state securities registration requirements (a) the offer and the sale of securities pursuant to the Plan and (b) subsequent transfers of such securities.

The Debtors have not filed a registration statement under the Securities Act or any other federal or state securities laws with respect to the new securities that may be deemed to be offered by virtue of the Solicitation. The Debtors are relying on exemptions from the registration requirements of the Securities Act, including, without limitations, Section 3(a)(9) thereof, to exempt the offer of the securities that may be deemed to be made pursuant to the solicitation of votes on the Plan. Section 3(a)(9) of the Securities Act provides that the registration requirements of the Securities Act will not apply to "any security exchanged by the issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange." Importantly, an exchange of debt is a separate offer from the exchange of claims for an enhanced litigation interest.

The Debtors are also relying on Section 18(b)(4)(C) of the Securities Act to exempt from Blue Sky Law requirements the offer of the securities that may be deemed to be made pursuant to the solicitation of votes on the Plan. Section 18(b)(4)(C) provides, among other things, that state securities laws will not apply to securities that are exempt from federal registration under Section 3(a)(9) of the Securities Act. The Debtors do not have any contract, arrangement, or understanding relating to, and will not, directly or indirectly, pay any commission or other remuneration to any broker, dealer, salesperson, agent, or any other person for soliciting votes to accept or reject the Plan. The Debtors have received assurances that no person will provide any information to Holders of Allowed Claims relating to the solicitation of votes on the Plan other than to refer the holders of 2026 Convertible Notes to the information contained in this Disclosure Statement. In addition, no broker, dealer, salesperson, agent, or any other person, is engaged or authorized to express any statement, opinion, recommendation, or judgment with respect to the relative merits and risks of the Plan.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws if three principal requirements are satisfied: (a) the securities must be issued "under a plan" of reorganization by the debtor or its successor under a plan or by an affiliate participating in a joint plan of reorganization with the debtor; (b) the recipients of the securities must hold a claim against, an interest in, or a claim for administrative expenses in the case concerning the debtor or such affiliate; and (c) the securities must be issued in exchange for the recipient's claim against or interest in the debtor, or such affiliate, or "principally" in such exchange and "partly" for cash or property. In reliance upon these exemptions and the exemption set forth in the preceding paragraph, including the exemptions provided by Sections 3(a)(9) and 18(b)(4)(C) of the Securities Act, the Debtors believe that the anticipated offer and sale of securities under the Plan will be exempt from registration under the Securities Act and Blue Sky Laws.

74

To the extent that the issuance of securities pursuant to the Plan is covered by Section 1145 of the Bankruptcy Code, such securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, securities governed by Section 1145 of the Bankruptcy Code generally may be able to be resold without registration under applicable Blue Sky Laws pursuant to various exemptions provided by the respective Blue Sky Laws of the various states; however, the availability of such exemptions cannot be known unless individual state Blue Sky Laws are examined. Therefore, recipients of such securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under applicable Blue Sky Laws in any given instance and as to any applicable requirements or conditions to such availability.

Recipients of the securities pursuant to the Plan are advised to consult with their own legal advisors as to the applicability of Section 1145 of the Bankruptcy Code and the availability of any exemption from registration under the Securities Act and Blue Sky Laws.

### 2.      Resales of Plan Securities; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer": (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (1) with a view to distribution of such securities and (2) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an "underwriter" within the meaning of Section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an "underwriter" under Section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11) of the Securities Act, is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 under the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling Person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. In addition, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling Person" and, therefore, an underwriter.

317390990v1

Resales of securities of the Plans by Entities deemed to be "underwriters" (which definition includes "controlling Persons") are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of securities who are deemed to be "underwriters" may be entitled to resell their securities pursuant to the non-exclusive safe harbor resale provisions of Rule 144 and Rule 144A of the Securities Act.

Generally, Rule 144 provides that if certain conditions are met, specified persons who resell restricted securities will not be deemed to be "underwriters" as defined in Section 2(a)(11) of the Securities Act. Rule 144 provides that:

(i)     a non-affiliate who has not been an affiliate during the preceding three months may resell restricted securities after a six-month holding period if at the time of the sale there is current public information regarding the issuer and after a one year holding period regardless of whether there is current public information regarding the issuer at the time of the sale; and

(ii)    an affiliate may sell restricted securities after a six month holding period if the issuer of the securities is, and has been for a period of at least ninety (90) days immediately before the sale, subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act and after a one-year holding period if the issuer of the securities is or has not been subject to such requirements, provided that in each case the affiliate otherwise complies with the volume, current public information, manner of sale and notice requirements of Rule 144.

Rule 144A provides a non-exclusive safe harbor exemption from the registration requirements of the Securities Act for resales to certain "qualified institutional buyers" of securities that are "restricted securities" within the meaning of the Securities Act, irrespective of whether the seller of such securities purchased its securities with a view towards reselling such securities, if certain other conditions are met (e.g., the availability of information required by paragraph 4(d) of Rule 144A and certain notice provisions). Under Rule 144A, a "qualified institutional buyer" is defined to include, among other persons "dealers" registered as such pursuant to Section 15 of the Exchange Act, and entities that purchase securities for their own account or for the account of another qualified institutional buyer and that, in the aggregate, own and invest on a discretionary basis at least $100 million in the securities of unaffiliated issuers.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling Person") with respect to the securities contemplated herein and in the Plan would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to such securities and, in turn, whether any Person may freely resell such securities. The Debtors recommend that potential recipients of securities under the Plan consult their own counsel

76

concerning their ability to trade such securities without compliance with the registration requirements of applicable federal and state securities laws.

### 3. Resale of Other Securities Exempt from Registration Requirements Pursuant to Section 4(a)(2) of the Securities Act

The Section 4(a)(2) Securities will be offered, issued, and distributed without registration under the Securities Act and applicable Blue Sky Laws and in reliance upon the exemption set forth in Section 4(a)(2) of the Securities Act and Regulation D. This offer, issuance, and distribution will not be exempt under Section 1145 of the Bankruptcy Code. Therefore, such Section 4(a)(2) Securities will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and pursuant to applicable Blue Sky Laws as described in the previous four paragraphs.

## XIV. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A. Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and to certain Holders of Claims. Except as otherwise described herein, the following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Legislative, judicial, or administrative changes or interpretations hereafter enacted could alter or modify the analysis and conclusions set forth below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. The discussion is not binding upon the IRS or any court. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein. This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This discussion does not address tax issues with respect to Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims, debt of Reorganized ICD, or shares of New Common Stock, as part of a hedge, straddle, conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds its Claim

77

as a "capital asset" (within the meaning of Section 1221 of the IRC). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

1.      **Cancellation of Debt and Reduction of Tax Attributes**

Absent an exception, a debtor will recognize cancellation of debt income ("**COD Income**") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness issued, and (z) the fair market value of any new consideration (including equity) given, in each case, in satisfaction of such indebtedness at the time of the exchange.

A debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a bankruptcy court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets; (e) passive activity loss and credit carryovers; and (f) foreign tax credits. A debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC. Absent such election, a debtor's tax basis in its assets cannot be reduced below the total amount of its liabilities outstanding immediately after the discharge. In the context of a group of corporations filing a consolidated federal income tax return, special rules apply to determine how the tax attributes of the group are reduced.

2.      **Limitation of Tax Attributes**

The Debtors currently expect that their federal NOLs may be reduced as a result of the bankruptcy exception to inclusion of COD Income in gross income. In addition to NOLs, the Debtors have significant tax basis in assets and a carryover of disallowed interest expense. The amount of tax attributes that will be available to the Reorganized Debtors at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by the Debtors in 2024 and later; (b) the fair market value of the shares of New Common Stock; (c) the

78

issue price of the Exit Facility Term Loans; and (d) the amount of COD Income incurred by the Debtors in connection with Consummation of the Plan. Following Consummation of the Plan, the Debtors anticipate that any remaining tax attributes, including a carryover of disallowed interest expense, allocable to periods before the Effective Date ("**Pre-Change Losses**") may be subject to limitation under Section 382 of the IRC by reason of the transactions pursuant to the Plan.

Under Section 382 of the IRC, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors anticipate that the issuance of the shares of New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of Section 382 of the IRC applies. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of COD Income.

For this purpose, if a corporation has a "net unrealized built-in loss" (generally, an aggregate amount of tax basis in excess of fair market value) at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization and depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change. The Debtors currently anticipate that they may have a net unrealized built-in loss as of the Effective Date.

### (a) General Section 382 Annual Limitation

This discussion refers to the limitation determined under Section 382 of the IRC in the case of an ownership change as the "**Section 382 Limitation**." In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long term tax exempt rate" (which is currently 3.31 percent for November 2024). The Section 382 Limitation may be increased during the five-year period following the ownership change to the extent that the Debtors have a "net unrealized built-in gain" rather than a net unrealized built-in loss as of the Effective Date. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if a corporation that has undergone an ownership change does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the Section 382 Limitation is generally reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to net unrealized built-in gain discussed above). As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

### (b)  Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when shareholders and/or so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their claims or interests, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "**382(*l*)(5) Exception**"). Under the 382(*l*)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis but, instead, the debtor's NOL carryforwards are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(*l*)(5) Exception applies and the debtor undergoes another ownership change within two years after the Effective Date, then the debtor's Pre-Change Losses effectively are eliminated in their entirety.

A "qualified creditor" is any creditor who has held the debt of a debtor for at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" that has been owned at all times by such creditor. A creditor who does not become a direct or indirect five-percent shareholder of a reorganized debtor may generally be treated by the debtor as having always held any debt owned immediately before the ownership change.

Where the 382(*l*)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(*l*)(5) Exception), a second special rule will generally apply (the "**382(*l*)(6)  Exception**"). When the 382(*l*)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(*l*)(6) Exception also differs from the 382(*l*)(5) Exception in that the debtor corporation is not required to reduce its NOL carryforwards by interest deductions by the amount of interest deductions claimed within the prior three-year period as described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses. An election to apply the 382(*l*)(6) Exception rather than the 382(*l*)(5) Exception must be made on the tax return for the year in which the Effective Date occurred.

The Debtors have not yet determined whether or not the 382(*l*)(5) Exception will apply. Even if the 382(*l*)(5) Exception applies, the Reorganized Debtors may elect out of the 382(*l*)(5) Exception, particularly if it appears likely that another ownership change would be expected to occur within two years after emergence. If the 382(*l*)(5) Exception is unavailable or the Debtors elect out, the 382(*l*)(6) Exception would apply. The Reorganized Debtors will evaluate the known circumstances at the time, and assuming the 382(*l*)(5) Exception is available, decide which exception to apply after consultation with and subject to the approval by the Exit Facility Lenders. In either case, the Debtors expect that their use of Pre-Change Losses (if any) after the Effective Date will be subject to limitation based on the rules discussed above. Regardless of whether the Reorganized Debtors take advantage of the 382(*l*)(6) Exception or the 382(*l*)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely

affected if an "ownership change" within the meaning of Section 382 of the IRC were to occur after the Effective Date.

### C. Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Claims

The U.S. federal income tax consequences of the Plan to Holders of Claims, including the character and amount of income, gain or loss recognized as a consequence of the Plan, will depend upon, among other things, (a) the manner in which a Holder acquired a Claim; (b) the length of time the Claim has been held; (c) whether the Claim is a capital asset in the hands of the Holder; (d) the method of tax accounting of the Holder; and (e) with respect to any Claim, (i) whether the Claim was acquired at a discount, (ii) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or prior years, (iii) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim, and (iv) whether the Claim is an installment obligation for U.S. federal income tax purposes.

EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN IS STRONGLY URGED TO CONSULT ITS OWN TAX ADVISORS REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### 1. General

A Holder of a Claim may recognize ordinary income or loss with respect to any portion of its Claim attributable to accrued but unpaid interest. A Holder who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as a payment of interest, regardless of whether such Holder realizes an overall gain or loss as a result of surrendering its Claim. In general, a Holder that previously included in its income accrued but unpaid interest attributable to its Claim will recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such Holder realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Although the manner in which consideration is to be allocated between accrued interest and principal for these purposes is unclear under present law, the Debtors intend to allocate for U.S. federal income tax purposes the consideration paid pursuant to the Plan with respect to a Claim first to the principal amount of such Claim as determined for U.S. federal income tax purposes and then to accrued interest, if any, with respect to such Claim. Accordingly, in cases where a Holder receives consideration in an amount that is less than the principal amount of its Claim, the Debtors intend to allocate the full amount of consideration transferred to such Holder to the principal amount of such obligation and to take the position that no amount of the consideration to be received by such Holder is attributable to accrued interest. There is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Subject to the foregoing rules relating to accrued interest, gain or loss recognized for U.S. federal income tax purposes as a result of the Consummation of the Plan by Holders of Claims that hold their Claims as capital assets generally will be treated as a gain or loss from the sale or

exchange of such capital asset. Capital gain or loss will be long-term if the Claim was held by the Holder for more than one year and otherwise will be short-term. Any capital losses realized generally may be used by a corporate Holder only to offset capital gains, and by an individual Holder only to the extent of capital gains plus $3,000 of other income.

### 2.      Market Discount

The market discount provisions of the IRC may apply to holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if its stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, such holder's tax basis in the debt obligation immediately after its acquisition (any such excess, "**market discount**"). In general, a market discount obligation is treated as having accrued market discount as of any date equal to the total market discount multiplied by a fraction, the numerator of which is the number of days the holder has owned the market discount obligation and the denominator of which is the total number of days that remained until maturity at the time the holder acquired the market discount obligation. If a Holder has Claims with accrued market discount and such Holder recognizes gain upon the exchange of its Claims for property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such recognized gain, unless such Holder elected to include the market discount in income as it accrued. Holders who have Claims with accrued market discount should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances. In particular, Holders of Claims that are "securities" for U.S. federal income tax purposes and that are exchanged for shares of New Common Stock should consult their tax advisors regarding recognition of ordinary income upon a subsequent disposition of such shares of New Common Stock.

### 3.      Definition of "Security"

The term "security" is not defined in the IRC or in the Treasury Regulations. Whether an instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is generally not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### 4.      Bad Debt and/or Worthless Securities Deduction

A Holder who receives an amount in respect of a Claim less than the Holder's tax basis in the claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction

317390990v1

in some amount under Section 166(a) of the IRC or a worthless securities deduction under Section 165(g) of the IRC. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### 5.       Consequences to Holders that are Non-United States Persons

Holders of Claims that are not "United States persons" within the meaning of Section 7701(a)(30) of the IRC ("**Non-U.S. Holders**") generally will not be subject to U.S. federal income tax with respect to property (including cash) received in exchange for such Claims, unless (a) such Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes, (b) if such Holder is an individual, such Holder is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met, or (c) such Claim constitutes a United States real property interest ("**USRPI**"), as described below. A Non-U.S. Holder described in (a) above will generally be subject to U.S. federal income tax on the exchange in the same manner as if such Non-U.S. Holder were a United States person as described herein. In the case of a Non-U.S. Holder that is a foreign corporation, any gain recognized on the exchange may also be subject to an additional branch profits tax at a rate of 30 percent (or a lower applicable income tax treaty rate). A Non-U.S. Holder described in (b) above will generally be subject to U.S. federal income tax at a rate of 30 percent (or a lower applicable income tax treaty rate) on any gain recognized on the exchange, which may be offset by certain U.S.-source capital losses. A Non-U.S. Holder exchanging a USRPI generally will be subject to U.S. federal income tax on a taxable disposition of that USRPI in the same manner as Non-U.S. Holders described in (a) (except that branch profits tax would not apply).

A Claim will constitute a USRPI if (a) Shoreview Holdings LLC is or has been a United States real property holding corporation ("**USRPHC**") for U.S. federal income tax purposes at any time within the shorter of the five-year period ending on the date of such exchange or the period that the exchanging Non-U.S. Holder held such Claim and (b) the Claim includes a right to acquire, by purchase, conversion or otherwise, an equity interest in Shoreview Holdings LLC, and one of the exceptions below does not apply. Generally, a corporation is a USRPHC if the fair market value of its U.S. real property interests equals or exceeds 50 percent of the sum of the fair market value of its worldwide real property interests and its other assets used or held for use in a trade or business. The Debtors believe that Shoreview Holdings LLC currently is not, and expect that it will not become in the foreseeable future, a USRPHC for U.S. federal income tax purposes, however no assurances can be made that Shoreview Holdings LLC will not become a USRPHC in the future.

Non-U.S. Holders of 2026 Convertible Notes are encouraged to consult with their tax advisors on the tax consequences of the exchange, including the certification and filing requirements that may be necessary to meet these exceptions.

6. **Consequences to U.S. Holders of Ownership and Dispositions of Exit Facilities**

(a) **Payments of Interest**

Stated interest on the Exit Facilities generally will be taxable to a U.S. Holder as ordinary income at the time such interest is received or accrued, in accordance with such U.S. Holder's method of tax accounting for U.S. federal income tax purposes.

(b) **Sale or Other Taxable Disposition**

A U.S. Holder will recognize gain or loss on the sale, exchange, redemption, retirement or other taxable disposition of the Exit Facilities. The amount of such gain or loss will generally equal the difference between the amount received for the Exit Facilities in cash or other property valued at fair market value (less amounts attributable to any accrued but unpaid interest, which will be taxable as ordinary income (as described above under "— Payments of Interest") to the extent not previously included in income) and the U.S. Holder's adjusted tax basis in the Exit Facilities. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. Holder has held the Exit Facility Term Loans for more than one year at the time of sale or other taxable disposition. Long-term capital gains recognized by certain non-corporate U.S. Holders, including individuals, generally will be taxable at a reduced rate. The deductibility of capital losses is subject to limitations.

7. **Consequences to Non-U.S. Holders of Ownership and Dispositions of Exit Facilities**

(a) **Payments of Interest**

Subject to the discussions below concerning backup withholding and Foreign Account Tax Compliance Act ("**FATCA**") withholding (as described below), interest paid on the Exit Facilities to a Non-U.S. Holder that is not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to U.S. federal income tax and will be exempt from withholding of U.S. federal income tax under the "portfolio interest" exemption if the Non-U.S. Holder properly certifies as to its foreign status, as described below, and:

- the Non-U.S. Holder does not, actually or constructively, own 10% or more of the total combined voting power of all classes of stock of Reorganized Shoreview Holdings LLC entitled to vote;

- the Non-U.S. Holder is not a controlled foreign corporation related, actually or constructively, to Reorganized Shoreview Holdings LLC; and

- the Non-U.S. Holder is not a bank whose receipt of interest on the Exit Facilities is in connection with an extension of credit made pursuant to a loan agreement entered into in the ordinary course of its trade or business.

The portfolio interest exemption generally applies only if the Non-U.S. Holder also appropriately certifies as to its foreign status. A Non-U.S. Holder can generally meet the certification requirement by providing a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) to the applicable withholding agent. If a Non-U.S. Holder holds the Exit Facilities through a financial institution or other agent acting on its behalf, such Non-U.S. Holder may be required to provide appropriate certifications to the agent. Such Non-U.S. Holder's agent will then generally be required to provide appropriate certifications to the applicable withholding agent, either directly or through other intermediaries. Special rules apply to foreign partnerships, estates and trusts, and in certain circumstances certifications as to the foreign status of partners, trust owners or beneficiaries may have to be provided to the applicable withholding agent. In addition, special rules apply to qualified intermediaries that enter into withholding agreements with the IRS.

If a Non-U.S. Holder does not satisfy the requirements above, payments of interest made to such Non-U.S. Holder will be subject to U.S. federal withholding tax at a rate of 30 percent, unless (i) the Non-U.S. Holder provides the applicable withholding agent with a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) claiming a reduced rate of withholding under the benefits of an applicable income tax treaty, or (ii) the payments of interest are effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, are attributable to a permanent establishment or fixed base maintained by the Non-U.S. Holder in the United States) and the Non-U.S. Holder meets certain certification requirements.

The certifications described above must be provided to the applicable withholding agent prior to the payment of interest and must be updated periodically. Non-U.S. Holders that do not timely provide the applicable withholding agent with the required certification, but that qualify for a reduced rate under an applicable income tax treaty, may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding the U.S. federal income tax consequences of purchasing, owning and disposing of the Exit Facility Term Loans, including their entitlement to benefits under any applicable income tax treaty.

### (b)　Sale or Other Taxable Disposition

Subject to the discussion below concerning backup withholding, a Non-U.S. Holder will not be subject to U.S. federal income tax on any gain realized upon the sale, exchange, redemption, retirement or other taxable disposition of the Exit Facilities (except to the extent attributable to accrued but unpaid interest) unless:

- the gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, the Non-U.S. Holder maintains a permanent establishment or a fixed base in the United States to which such gain is attributable); or

- the Non-U.S. Holder is an individual who has been present in the United States for 183 days or more during the taxable year of the disposition and certain other requirements are met.

85

Non-U.S. Holders should consult their tax advisors regarding the U.S. federal income tax consequences of receiving, owning and disposing of the Exit Facility Term Loans, including any applicable income tax treaties that may provide for different rules.

### 8. Consequences to U.S. Holders of Ownership and Dispositions of New Common Stock

#### (a) Dividends on New Common Stock

Any distributions made on account of the New Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current and accumulated earnings and profits of Reorganized Shoreview Holdings LLC as determined under U.S. federal income tax principles. "Qualified dividend income" received by an individual U.S. Holder is subject to preferential tax rates. To the extent that a U.S. Holder receives distributions that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares of the New Common Stock. Any such distributions in excess of the U.S. Holder's basis in its shares of the New Common Stock (determined on a share-by-share basis) generally will be treated as capital gain.

Subject to applicable limitations, distributions treated as dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as Reorganized Shoreview Holdings LLC has sufficient earnings and profits and certain holding period requirements are satisfied. The length of time that a U.S. Holder has held its stock is reduced for any period during which such U.S. Holder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends-received deduction may be disallowed.

#### (b) Sale, Redemption, or Repurchase of New Common Stock

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of the New Common Stock. Such capital gain generally will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder has held the New Common Stock for more than one year. Long-term capital gains of an individual taxpayer generally are taxed at preferential rates. The deductibility of capital losses is subject to certain limitations as described below.

Under the recapture rules of section 108(e)(7) of the IRC, a U.S. Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if such U.S. Holder took a bad debt deduction with respect to its Allowed Note Claims or recognized an ordinary loss on the exchange of its Allowed Notes Claims for New Common Stock.

### 9. Consequences to Non-U.S. Holders of Ownership and Dispositions of New Common Stock

Distributions with respect to the New Common Stock will generally be treated as dividend income to the extent such distributions are paid from the current or accumulated earnings and

profits of Reorganized Shoreview Holdings LLC as determined for U.S. federal income tax purposes. If a distribution exceeds the current and accumulated earnings and profits of Reorganized Shoreview Holdings LLC, the excess will generally be treated first as a return of capital to the extent of the Non-U.S. Holder's adjusted tax basis in the New Common Stock (and will reduce the Non-U.S. Holder's basis in such New Common stock) and thereafter as capital gain from the sale or exchange of such New Common Stock, subject to the tax treatment described below. Generally, the gross amount of dividends paid to Non-U.S. Holders will be subject to withholding of U.S. federal income tax at a rate of 30 percent or at a lower rate if an applicable income tax treaty so provides and Reorganized Shoreview Holdings LLC (or its agent) has received proper certification as to the application of that treaty.

Dividends that are "effectively connected" with a Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment of the Non-U.S. Holder) are generally subject to U.S. federal income tax on a net basis at regular graduated rates, in the same manner as if the Non-U.S. Holder were a United States person, and are exempt from the 30 percent withholding tax described above, provided that certain certification requirements are satisfied. Any such effectively connected dividends received by a Non-U.S. Holder that is a corporation may also, under certain circumstances, be subject to an additional "branch profits tax" at a rate of 30 percent or such lower rate as may be specified by an applicable income tax treaty.

To satisfy the IRS certification requirements in order to claim a reduction of withholding under an applicable income tax treaty , a Non-U.S. Holder will generally be required to provide a properly executed IRS Form W-8BEN or W-8BEN-E (if the holder is claiming the benefits of an income tax treaty) or IRS Form W-8ECI (for income effectively connected with the conduct of a trade or business in the United States) or other suitable form. A Non-U.S. Holder eligible for a reduced rate of withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by filing an appropriate claim for refund with the IRS. Non-U.S. Holders should consult their tax advisors regarding their entitlement to benefits under an applicable income tax treaty and the specific manner of claiming the benefits of the treaty.

Subject to the discussion below on FATCA withholding, a Non-U.S. Holder will generally not be subject to U.S. federal income or withholding tax with respect to gain realized on the sale, exchange, or other taxable disposition of the New Common Stock, unless:

- in the case of a Non-U.S. Holder that is a non-resident alien individual, such Non-U.S. Holder is present in the United States for 183 days or more in the taxable year of the sale, exchange, or other taxable disposition, and certain other conditions are met;

- the gain is "effectively connected" with such Non-U.S. Holder's conduct of a trade or business within the United States (and, if required by an applicable treaty, the gain is attributable to a U.S. permanent establishment of such Non-U.S. Holder); or

- Reorganized Shoreview Holdings LLC is or has been a USRPHC for U.S. federal income tax purposes at any time within the shorter of the five-year period ending on the date of such sale, exchange, or other taxable disposition or the period that such Non-U.S. Holder held such New Common Stock and either (a) the New Common Stock was not treated as

87

regularly traded on an established securities market in the calendar year in which the sale, exchange, or other taxable disposition occurs, or (b) such Non-U.S. Holder owns or owned (actually or constructively) more than five percent of the total fair market value of the New Common Stock at any time during the shorter of the two periods described above.

A Non-U.S. Holder described in the first bullet point above will generally be subject to U.S. federal income tax at a rate of 30 percent (unless otherwise provided by an applicable treaty) on any capital gain recognized on the disposition of the New Common Stock, which may be offset by certain U.S.-source capital losses.

A Non-U.S. Holder whose gain is described in the second bullet point above will generally be subject to U.S. federal income tax on the net gain from the disposition of the New Common Stock at regular graduated rates in the same manner as if such Non-U.S. Holder were a United States person. In the case of a Non-U.S. Holder that is a foreign corporation, such gain may also be subject to an additional branch profits tax rate of 30 percent (or a lower applicable treaty rate). The Debtors believe that Shoreview Holdings LLC currently is not, and expect that it will not become in the foreseeable future, a USRPHC for U.S. federal income tax purposes, however no assurances can be made that Shoreview Holdings LLC will not become a USRPHC in the future.

Non-U.S. Holders should consult their tax advisors with respect to the application of the foregoing rules to their ownership and disposition of the New Common stock

## 10.    Withholding and Reporting

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim. Additionally, backup withholding, currently at a rate of 24 percent, will generally apply to such payments if a Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

## 11.    FATCA

Pursuant to Sections 1471 through 1474 of the IRC, foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, and other investment vehicles) and certain other foreign entities who do not comply with certain information reporting

rules with respect to their U.S. account holders investors or owners may be subject to a withholding tax on U.S.-source payments made to them. A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements generally will be subject to a 30 percent withholding tax with respect to any "withholdable payments." For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual, or periodical income (including interest paid on the Claims and distributions, if any on shares of New Common Stock). Under the Treasury Regulations, withholding under FATCA will generally apply to payments of interest on the Claims and the Exit Facility and dividends on shares of New Common Stock. Withholding with respect to the gross proceeds of a disposition of any stock, debt instrument, or other property that can produce U.S.-source dividends or interest has been eliminated under proposed Treasury Regulations, which can be relied on until final regulations become effective. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstance.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AND DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

### D.    Reservation of Rights

The foregoing discussion is subject to change (possibly substantially) based on, among other things, subsequent changes to the Plan and events that may subsequently occur that may impact the timeline for the transactions contemplated by the Plan. The Debtors and the Debtors' advisors reserve the right to modify, revise, or supplement this discussion and other tax related sections of the Plan and Disclosure Statement in accordance with the terms of the Plan and the Bankruptcy Code.

*[Remainder of page intentionally left blank]*

## **Exhibit A**

Plan

## **Exhibit B**

Liquidation Analysis
(*to come*)

## **Exhibit C**

Financial Projections
(*to come*)

## **Exhibit D**

Valuation Analysis
(*to come*)